# EXHIBIT B

Mary L. Warren v. Flyway Express, LLC, DHL Express (USA), Inc.

Preliminary Expert Report

**Prepared By:**

W. Cody Middlebrook, CDS, CDT

Transportation Safety and Compliance Consultant



**Contact Information:**

Cody@FleetSafetyExpert.com

(205) 871-4455

FleetSafetyExpert.com

**For:**

Henry Reaves, Esq. | Reaves Law Firm, PLLC

**Case Information:**

Case Number: 2:25-cv-02588-SHL-tmp

Court: Western District Court of Tennessee, Western Division

Date of Report:

January 30, 2026



**Table of Contents**

1. Introduction ............................................................................................................ 4

1.1 Purpose of the Report ......................................................................................... 4

1.2 Scope of Review ................................................................................................. 4

1.3 Assignment ......................................................................................................... 4

1.4 Limitations .......................................................................................................... 5

2. Qualifications and Methodology ........................................................................... 6

2.1 Qualifications ...................................................................................................... 6

2.2 Methodology ....................................................................................................... 7

3. Materials Reviewed ................................................................................................ 8

4. Regulations and Standards Governing Motor Carriers & Drivers .......................... 9

4.1 Historical Development of FMCSRs ..................................................................... 9

4.2 Federal Motor Carrier Safety Regulations (FMCSRs) ....................................... 11

4.3 Obligations of Motor Carriers............................................................................ 11

4.4 Motor Carrier Compliance Document Retention Requirements ......................... 13

4.5 Industry Standards ............................................................................................ 16

4.6 Application for This Analysis ............................................................................. 18

4.7 Corporate Safety Oversight of Mixed-Fleet Operations.................................... 19

5. Analysis and Findings .......................................................................................... 20

5.1 Subject Collision ............................................................................................... 20

5.2 Motor Carrier Analysis (FLYWAY) ................................................................... 21

5.3 Motor Carrier Analysis (DHL) ........................................................................... 23

5.4 Knowledge and Compliance ............................................................................. 24

5.5 Driver Analysis .................................................................................................. 27

©W. Cody Middlebrook



24    5.5.1 Tennessee Comprehensive Driver License Manual .......................................... 28

25    5.5.2 Smith System 5 Keys ................................................................................... 31

26    5.5.3 ANSI/ASSE Z15.1-2017 .............................................................................. 34

27    5.6 Preventability .................................................................................................... 35

28    6. Opinion(s) ........................................................................................................... 36

29    7. Conclusion .......................................................................................................... 38

30    8. Appendices ......................................................................................................... 39

31    8.1 Appendix A: Materials Reviewed ...................................................................... 40

32    8.2 Appendix B: Bibliography ................................................................................. 41

33    8.4 Appendix D: CV ................................................................................................ 49

34    8.5 Appendix E: Supporting Documents .................................................................. 50

©W. Cody Middlebrook

# 1. Introduction

## *1.1 Purpose of the Report*

35  This report provides my professional opinions regarding the safety and regulatory compliance
36  practices of Flyway Express, LLC (referred to hereafter as FLYWAY) and DHL Express (USA),
37  Inc. (referred to hereafter as DHL) in relation to the collision on May 20, 2024. For the purposes
38  of this preliminary assessment, I have assumed the accuracy of the Plaintiff's allegations and the
39  Police Accident Report narrative regarding the involvement of FLYWAY/DHL vehicles. It
40  examines whether FLYWAY/DHL and their driver(s) adhered to Federal Motor Carrier Safety
41  Regulations (FMCSRs) and industry standards, conditioned upon the eventual evidentiary
42  verification of the drivers' identities and vehicle units. My analysis is based on the materials
43  provided, including the documents listed in Section 3, as well as my education, training, and
44  experience in the field of transportation safety and compliance. Should the underlying facts
45  regarding vehicle identification change through further discovery, I reserve the right to amend
46  these opinions.

## *1.2 Scope of Review*

47  This report evaluates the safety and compliance practices of FLYWAY/DHL in relation to
48  applicable federal/state regulations, industry standards, and recognized best practices. The
49  analysis examines all aspects of safety and regulatory compliance relevant to this matter,
50  including but not limited to driver qualifications, hours of service compliance, vehicle
51  maintenance, safety management practices, and any additional factors impacting the safe
52  operation of commercial motor vehicles. The scope of this review is based on the materials
53  provided through discovery, deposition testimony, and publicly available data, as well as my
54  professional experience and expertise in transportation safety and compliance.

## *1.3 Assignment*

55  I was engaged by Reaves Law Firm on behalf of the plaintiffs to provide expert analysis and
56  opinions regarding the safety and regulatory compliance practices of FLYWAY/DHL.

©W. Cody Middlebrook



57  Specifically, I was tasked with determining whether FLYWAY/DHL and their driver(s) adhered

58  to applicable FMCSRs and best practices, and whether deficiencies in compliance contributed to

59  the collision in question.

*1.4 Limitations*

60  This report is based solely on the materials provided to me, including discovery documents,

61  deposition testimony (if available), and publicly available data. The opinions expressed herein

62  are formed under the assumption that the materials provided are complete, accurate, and

63  authentic.

64  If additional evidence or documents become available, I reserve the right to amend or

65  supplement this report as necessary. My analysis is limited to the scope of my expertise in

66  transportation safety and regulatory compliance and does not extend to matters outside this area,

67  such as accident reconstruction, medical causation, or legal conclusions.

68  This report assesses compliance with applicable FMCSRs /state regulations, industry standards,

69  and recognized best practices. Differences in the interpretation or application of these standards

70  may influence the findings. The opinions and conclusions expressed in this report are specific to

71  the facts and circumstances of this case and are not intended for use in other cases or contexts.

> To the extent that a response is necessary, ==Flyway states that Winchester Road is a main road in Memphis, Tennessee that is located near its local station. Flyway would expect all or most of its drivers to travel on Winchester Road on any given day.== Defendant identifies the following Flyway drivers that were operating vehicles on May 20, 2024. Any additional contact information is unknown at this time. Defendant reserves the right to supplement this response.

72

73  **Figure 1:** *FLYWAY's answer to Interrogatory No.1 in Defendant Flyway Express, LLC*

74  *Responses to Plaintiff's First Set of Interrogatories*

©W. Cody Middlebrook



75 As of the date of this report, discovery has not yielded specific vehicle VINs or driver

76 identifications for the FLYWAY/DHL units allegedly involved. FLYWAY has acknowledged in

77 discovery responses that the location of the collision is a route frequented by its drivers but states

78 it cannot confirm involvement without further identification.

## 2. Qualifications and Methodology

### 2.1 Qualifications

79 The opinions and conclusions presented in this report are based on extensive experience and

80 expertise in motor carrier safety and regulatory compliance, including:

81 • Over 10 years of professional experience in the transportation and safety industries.

82 • Class A Commercial Driver's License (CDL) w/ Hazmat Endorsement – Alabama Law

83   Enforcement Agency (ALEA)

84 • Certification as a Certified Director of Safety (CDS) and Certified Driver Trainer (CDT)

85   through the North American Transportation Management Institute (NATMI).

86 • Specialized knowledge of Federal Motor Carrier Safety Regulations (FMCSRs),

87   including parts 40; 107; 171; 172; 173; 177; 178; 180; 350; 355; 380; 381; 382; 383; 384;

88   385; 390; 391; 392; 393; 395; 396; 397; 399.

89 • Expertise in conducting mock FMCSA audits and regulatory compliance reviews tailored

90   to motor carrier operations.

91 • Designing and delivering training programs on defensive driving, hours of service

92   compliance, driver qualification, and fleet safety best practices.

93 • Consulting experience in over 200 litigation matters involving FMCSA compliance,

94   accident causation, and safety evaluations.

95 • Leveraged academic training in sociology to develop expertise in qualitative research

96   methods, including systemic analysis of organizational behavior, compliance patterns,

97   and risk assessment within the transportation industry.

98 • I have extensive expertise in industry standards and guidance, including safety criteria,

99   operational best practices, and federal and state statutes governing motor carrier

©W. Cody Middlebrook



100    operations. My knowledge encompasses resources from the FMCSA, CVSA, ANSI,

101    AAMVA, NSC, Smith System, PTDI, and others, as well as key legislative acts shaping

102    transportation safety and compliance.

103    Further details about my professional background, education, certifications, and affiliations are

104    provided in the attached Curriculum Vitae.

*2.2 Methodology*

105    The methodology for this report employs a structured and repeatable framework that combines

106    qualitative scientific methods with industry-recognized practices.[1] This approach includes the

107    systematic analysis of materials such as Driver Qualification Files, Hours of Service logs,

108    vehicle maintenance records, safety policies, deposition testimony, and publicly available

109    FMCSA data, including SMS scores and SAFER reports. Compliance with FMCSRs and state-

110    adopted standards was assessed through benchmarking against established safety and operational

111    standards within the commercial transportation industry.

112    The analysis incorporates a qualitative risk assessment approach to evaluate the likelihood and

113    severity of safety risks, with a focus on identifying systemic deficiencies in safety management

114    controls and their potential impact on operational safety.[2] This process is designed to provide a

115    detailed assessment of adherence to safety and compliance expectations for motor carriers and

116    drivers. In a transportation safety context, a systemic analysis examines patterns of accidents,

117    compliance violations, and systemic deficiencies across motor carriers and drivers to identify

118    risk factors and recommend targeted interventions.[3] This approach supports a comprehensive

---

[1] **Science** involves systematic methodologies to gather and analyze evidence to understand phenomena. Both qualitative and quantitative methods meet these criteria by relying on structured, replicable, and evidence-based approaches. **Qualitative analysis** focuses on understanding behaviors, processes, and compliance patterns through non-numeric data such as observations, testimony reviews, and document reviews. This approach is particularly suited to fields like transportation safety and compliance, where regulations and human factors intersect.
[2] A **qualitative risk assessment approach** is a systematic method for evaluating risks by analyzing non-quantifiable factors, such as behaviors, processes, and compliance patterns, to identify potential hazards and their impacts. It relies on subjective but structured evaluation, often using descriptive analysis, professional judgment, and comparative benchmarking against established standards or best practices. This approach emphasizes context, nuance, and detailed understanding, making it particularly valuable in areas where numerical data may be unavailable, insufficient, or impractical to measure.
[3] Rasmussen SA, Goodman RA (Eds.). (2019). *The CDC Field Epidemiology Manual*. Oxford University Press. "Qualitative methods belong to a branch of social science inquiry that emphasizes the importance of context, subjective meanings, and motivations in understanding human behavior patterns. Qualitative approaches definitionally rely on open-ended, semi structured, non-numeric strategies for asking questions and recording responses. Conclusions are drawn from systematic visual or textual analysis involving repeated reading, coding, and organizing

©W. Cody Middlebrook



119 understanding of safety and compliance issues in transportation. The analysis incorporates

120 qualitative and quantitative methods to evaluate the behaviors, processes, and compliance

121 patterns of motor carriers and drivers.[4]

122 Key elements of the methodology include:

- 123 **Document Analysis**: A detailed review of materials such as Driver Qualification Files,
- 124 Hours of Service logs, maintenance records, and FMCSA data.
- 125 **Qualitative Risk Assessment**: Identifying systemic deficiencies and their potential
- 126 impact on operational safety.
- 127 **Compliance Benchmarking**: Comparing motor carrier and driver practices against
- 128 regulatory requirements and recognized industry standards.
- 129 **Professional Judgment**: Synthesizing findings using over a decade of expertise in
- 130 transportation safety and compliance.

131 All findings were interpreted using professional judgment informed by over 10 years of

132 experience in fleet safety, compliance, and operations. My academic background in sociology

133 provides a foundational understanding of systemic factors and behavioral patterns, which

134 complements my ability to analyze compliance data, operational practices, and driver behavior.

135 This interpretation was supported by FMCSR requirements, recognized industry standards, and

136 established research frameworks, ensuring the methodology is scientific, systematic, transparent,

137 and grounded in widely accepted practices within the field of transportation safety.

## 3. Materials Reviewed

138 This report is based on a review of materials provided during discovery and additional references

139 relevant to the field of transportation safety and compliance. A complete list of materials

140 reviewed, including case-specific documents and a bibliography of industry standards and

---

information into structured and emerging themes. Because textual analysis is relatively time- and skill-intensive, qualitative samples tend to be small and purposively selected to yield the maximum amount of information from the minimum amount of data collection. Although qualitative approaches cannot provide representative or generalizable findings in a statistical sense, they can offer an unparalleled level of detail, nuance, and naturalistic insight into the chosen subject of study."

[4] Leavy, P. (Ed.). (2014). *The Oxford handbook of qualitative research*. Oxford University Press.

©W. Cody Middlebrook



141  references, is included in the appendices. These materials represent the foundational sources

142  necessary to evaluate compliance with regulatory requirements and industry best practices.

## 4. Regulations and Standards Governing Motor Carriers & Drivers

143  This report evaluates the safety and compliance practices of FLYWAY/DHL within the context of the

144  Federal Motor Carrier Safety Regulations (FMCSRs), their historical development, and the

145  broader legislative and industry standards governing motor carrier operations.

### 4.1 Historical Development of FMCSRs

146  The FMCSRs have developed over decades to establish uniform safety standards for commercial

147  motor vehicle (CMV) operations, reducing crashes, injuries, and fatalities. The framework

148  originated with the Motor Carrier Act of 1935, which gave the Interstate Commerce Commission

149  (ICC) authority over motor carriers, focusing primarily on economic regulation but introducing

150  basic safety standards.[5] The Department of Transportation Act of 1966 created the Department of

151  Transportation (DOT) and transferred motor carrier safety responsibilities to the Federal

152  Highway Administration (FHWA), with the Bureau of Motor Carrier Safety (BMCS) managing

153  safety enforcement.[6]

154  The Highway Safety Act of 1970 expanded federal oversight, creating the National Highway

155  Traffic Safety Administration (NHTSA) to address vehicle safety design while the BMCS

156  focused on CMV operational safety.[7] The FMCSRs, first codified in the 1960s, were significantly

157  strengthened by the Motor Carrier Safety Act of 1984. Under 49 U.S.C. § 31136, the Act

158  empowered the Secretary of Transportation to prescribe safety regulations covering driver

159  qualifications, vehicle maintenance, operational safety, and other critical aspects of commercial

160  motor vehicle operations.[8] The Commercial Motor Vehicle Safety Act of 1986 established the

---

[5] *Motor Carrier Act of 1935*: Public Law 74-255, codified at 49 U.S.C. §§ 301–327.
[6] *Department of Transportation Act of 1966*: Public Law 89-670, codified at 49 U.S.C. § 101.
[7] *Highway Safety Act of 1970*: Public Law 91-605, codified at 23 U.S.C. § 401.
[8] *Motor Carrier Safety Act of 1984*: Public Law 98-554, codified at 49 U.S.C. § 31136.

©W. Cody Middlebrook



161   Commercial Driver's License (CDL) program, ensuring consistent standards for driver

162   qualifications across states.[9]

163   The American Association of Motor Vehicle Administrators (AAMVA), founded in 1933, has

164   played a pivotal role in shaping driver licensing standards and promoting uniform practices

165   among state agencies to enhance highway safety.[10] Under a 1997 cooperative agreement with the

166   FHWA, AAMVA developed the Model CDL Manual, the *only* FMCSA-approved resource that

167   serves as the definitive guide for state CDL training, testing, and licensing standards.[11] [12]

168   In 2000, the Federal Motor Carrier Safety Administration (FMCSA) was established under the

169   Motor Carrier Safety Improvement Act of 1999, separating motor carrier safety from the

170   FHWA.[13] The FMCSA's mission focuses on reducing large truck and bus-related crashes through

171   regulatory oversight and enforcement. Subsequent legislation, including the Safe, Accountable,

172   Flexible, Efficient Transportation Equity Act (SAFETEA-LU, 2005), Moving Ahead for

173   Progress in the 21st Century Act (MAP-21, 2012), and the Fixing America's Surface

174   Transportation (FAST) Act (2015), further strengthened FMCSA's authority. These acts

175   introduced programs such as the Compliance, Safety, Accountability (CSA) initiative, mandated

176   the use of Electronic Logging Devices (ELDs), and emphasized safety programs like drug and

177   alcohol testing and medical examiner certification.

178   The FMCSRs are codified in Title 49 of the Code of Federal Regulations (CFR), Parts 300–399,

179   and encompass areas such as driver qualifications (Part 391), hours of service (Part 395), vehicle

180   maintenance (Part 396), and operational safety rules (Part 392).[14] These regulations are designed

181   to establish uniform standards for CMV safety.

---

[9] *Commercial Motor Vehicle Safety Act of 1986*, Public Law 99-570, codified at 49 U.S.C. §§ 31301–31317.

[10] American Association of Motor Vehicle Administrators, *About AAMVA*. https://www.aamva.org/About-AAMVA.

[11] Federal Highway Administration (FHWA), *Cooperative Agreement No. DTFH61-97-X-00017*, awarded to the American Association of Motor Vehicle Administrators, 1997.

[12] American Association of Motor Vehicle Administrators, *Model Commercial Driver License Manual*, 2005 CDL Test System, July 2010 version (Arlington, VA: AAMVA, 2010)

[13] *Motor Carrier Safety Improvement Act of 1999*: Public Law 106-159, codified at 49 U.S.C. §§ 31100 et seq.

[14] FMCSRs: Title 49 CFR, Parts 300–399.

©W. Cody Middlebrook



### 4.2 Federal Motor Carrier Safety Regulations (FMCSRs)

182   The FMCSRs were established to create uniform safety standards for commercial motor vehicle

183   (CMV) operations, with the primary goal of reducing crashes, injuries, and fatalities involving

184   large trucks and buses. Administered by the FMCSA, a division of the Department of

185   Transportation (DOT), these regulations provide comprehensive guidance on areas such as driver

186   qualifications, vehicle maintenance, hours of service, and operational safety. The FMCSA,

187   created in 2000 under the Motor Carrier Safety Improvement Act of 1999, is tasked with

188   overseeing the implementation and enforcement of the FMCSRs. Its mission is "to reduce

189   crashes, injuries, and fatalities involving large trucks and buses."[15] While the FMCSRs apply

190   directly to interstate motor carriers, all 50 states have adopted these regulations, with minor

191   variations, to govern intrastate operations.[16] This ensures consistency in safety standards across

192   the country, though some states modify applicability thresholds. The FMCSRs and their adoption

193   reflect a coordinated effort to improve road safety nationwide through rigorous regulatory

194   oversight and enforcement.

### 4.3 Obligations of Motor Carriers

195   When applying for and obtaining a USDOT number, motor carriers are required to certify their

196   understanding and compliance with the FMCSRs. Both the legacy MCS-150 application process

---

[15] Federal Motor Carrier Safety Administration. (2023). *2023 Pocket Guide to Large Truck and Bus Statistics*. Washington, D.C.: U.S. Department of Transportation.
[16] **10,001 pounds and over (for-hire carriers):** Arkansas, California, Colorado, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kentucky (with exceptions), Maine, Maryland, Massachusetts, Michigan (specific parts), Minnesota, Nebraska, New Hampshire, New York, Ohio, Oregon, Pennsylvania, Rhode Island, Utah, Washington, West Virginia, Wisconsin. 14,001 pounds and over (private and for-hire carriers): Alaska. 17,001 pounds and over (private carriers): Pennsylvania. 18,001 pounds and over (private and for-hire carriers): Arizona, Connecticut. **26,001 pounds and over (private and for-hire carriers):** Alabama, Delaware, Kansas, Louisiana, Mississippi, Missouri, Montana, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Wyoming.

©W. Cody Middlebrook



197 and the newer Unified Registration System (URS) require motor carriers to agree to critical

198 safety and regulatory obligations as part of their registration.[17] [18] [19] [20]

199 Under the **MCS-150 system**, motor carriers were explicitly required to:

200  1. Maintain current copies of the FMCSRs, Federal Motor Vehicle Safety Standards

201     (FMVSS), and Hazardous Materials Regulations (HMR) (if applicable).

202  2. Establish systems for:

203     o Ensuring driver qualifications, including maintaining safety records and verifying

204        proper licensing.

205     o Reviewing drivers' employment and driving histories for the past three years.

206     o Conducting annual reviews of driver records.

207     o Monitoring compliance with Hours of Service (HOS) rules through log audits and

208        driver training.

209     o Conducting drug and alcohol testing programs as required under 49 CFR Parts

210        382 and 40.

211  3. Ensure vehicle condition through:

212     o Systems for inspection, repair, and maintenance.

213     o Immediate correction of defects noted in inspections.

214  4. Maintain an accident register and implement accident countermeasures.

215  5. Produce records demonstrating compliance with the FMCSRs upon request within 48

216     hours.

217 With the transition to the **URS system**, these obligations were consolidated and reinforced.[21]

218 Applicants using URS must:

---

[17] Federal Motor Carrier Safety Administration. *Instructions for Form MCS-150, Motor Carrier Identification Report.* Available at: https://www.fmcsa.dot.gov.
[18] MCS-150A Safety Certification for Application for Motor Carrier Authority. Public Form. Codified under 49 U.S.C. § 13902 and § 31144.
[19] Federal Motor Carrier Safety Administration. (2023). *Unified Registration System (URS) Training Manual.* Available at: https://www.fmcsa.dot.gov.
[20] 49 CFR Part 390.201: Unified Registration System (URS) Requirements for New Entrants.
[21] The FMCSA transitioned from the MCS-150 system to the Unified Registration System (URS) in 2015 to streamline the registration process for motor carriers. **Federal Motor Carrier Safety Administration. Unified Registration System Final Rule. 78 FR 52608** (Aug. 23, 2013).

©W. Cody Middlebrook



1. Certify that they are knowledgeable of and will comply with FMCSRs, FMVSS, HMR (if applicable), and other statutory regulations administered by the Department of Transportation.

2. Agree to provide the required operations or services in compliance with safety fitness, operational regulations, and financial responsibility requirements.

3. Demonstrate the ability to maintain accurate and accessible records and produce them upon request by FMCSA or authorized officials.

4. Affirm their commitment to ensuring driver qualifications, HOS compliance, vehicle maintenance, and overall operational safety.

Both systems emphasize that carriers must take full responsibility for their compliance efforts and systems. These certifications are enforceable through FMCSA inspections and audits, with non-compliance potentially resulting in fines, civil penalties, or revocation of operating authority. These obligations highlight the carrier's role in proactively managing safety and adhering to regulatory standards.

By agreeing to these terms, motor carriers acknowledge their duty to prioritize safety and regulatory compliance, directly impacting the safety of the motoring public. These certifications provide a basis for evaluating compliance with the FMCSRs and assessing how systemic deficiencies may have contributed to [INDCIDENT/ACCIDENT]s or accidents.

*4.4 Motor Carrier Compliance Document Retention Requirements*

§ 49 CFR 390.5 defines "Principal place of business" as:

> …the single location designated by the motor carrier, normally its headquarters, for purposes of identification under this subchapter. **The motor carrier must make records required by parts 382, 387, 390, 391, 395, 396, and 397 of this subchapter available for inspection at this location within 48 hours** (Saturdays, Sundays, and Federal holidays excluded) after a request has been made by a special agent or authorized representative of the Federal Motor Carrier Safety Administration.[22] [Emphasis added].

---

[22] https://www.ecfr.gov/current/title-49/part-390#p-390.5T(Principal%20place%20of%20business)

©W. Cody Middlebrook



244    § 49 CFR 390.29 is entitled "Location of records or documents," and requires:

245    (a) A motor carrier with multiple offices or terminals may maintain the records and
246    documents required by this subchapter at its principal place of business, a regional office,
247    or driver work-reporting location unless otherwise specified in this subchapter. (b) **All**
248    **records and documents required by this subchapter** which are maintained at a
249    regional office or driver work-reporting location **shall be made available for inspection**
250    **upon request by a special agent or authorized representative of the Federal Motor**
251    **Carrier Safety Administration at the motor carrier's principal place of business or**
252    **other location specified by the agent or representative within 48 hours after a**
253    **request is made**. Saturdays, Sundays, and Federal holidays are excluded from the
254    computation of the 48-hour period of time.[23] [Emphasis added].

255    49 CFR §390.31 is entitled "Copies of records and documents," and requires "All records and

256    documents required to be maintained under this subchapter must be maintained for the periods

257    specified."[24]

258    The FMCSA Electronic Field Operations Training Manual (eFOTM), commonly referred to as

259    the EFOTM, is the internal compliance and enforcement manual used by FMCSA safety

260    investigators. It outlines how audits, investigations, compliance reviews, roadside enforcement

261    follow-up, and enforcement actions are to be conducted. Section 1.2.3.3.5 is entitled "Request

262    Company Files Maintained at Carrier's Location(s) – Onsite Investigations" and gives direction

263    to special agents or authorized representatives of the FMCSA performing motor carrier

264    investigations.  Section 1.2.3.3.5 states:

265    a (sic) motor carrier with multiple business locations must make the required records
266    available for inspection at the PPOB[25], or other location specified by FMCSA, within 48
267    hours upon your request. Saturday, Sunday, and Federal holidays are excluded from the
268    computation of the 48 hour period. When requesting records 48 hours before your
269    scheduled appointment, be sure the motor carrier understands this is an official request,
270    **when the 48-hour period begins and ends, and you are expecting the documents to**
271    **be available upon your arrival, or you will cite failing to maintain the appropriate**
272    **documents.**[26] [Emphasis added]

---

[23] https://www.ecfr.gov/current/title-49/section-390.29
[24] https://www.ecfr.gov/current/title-49/section-390.31
[25] PPOB – Principal Place of Business
[26] Federal Motor Carrier Safety Administration, Compliance Manual for eFOTM Redevelopment, June 1, 2022

©W. Cody Middlebrook





273

***Figure 2:*** *The eFOTM Compliance Manual diagram illustrates how investigators determine*
*whether carrier records must be immediately available or may be provided within 48 hours,*
*based on whether records are maintained at a single location or across multiple business*
*locations. (pg. 45)*

Motor carriers are required to maintain all compliance records mandated by parts 382, 387, 390,
391, 395, 396, and 397 in a complete, compliant, and readily accessible form.[27] The FMCSRs are
explicit that these documents must not only exist and be properly retained, they must be
produced immediately, or no later than within 48 hours, when requested by an FMCSA special
agent or authorized representative.[28] Records may be kept at a principal place of business,
regional office, or driver reporting location, but the burden remains on the motor carrier to
deliver them to the location specified by the agency within that 48 hour window. When the
FMCSA, or an authorized representative, requests compliance documents, production is

---

[27] **382** (Controlled Substances and Alcohol Use and Testing), **387** (Minimum Levels of Financial Responsibility for Motor Carriers), **390** (Federal Motor Carrier Safety Regulations; General), **391** (Qualifications of Drivers), **395** (Hours of Service), **396** (Inspection, Repair, and Maintenance), and **397** (Hazardous Materials).
[28] Excluding weekends and federal holidays.

©W. Cody Middlebrook



286 mandatory and immediate, and carriers are expected to have systems in place to meet that
287 requirement.

### 4.5 Industry Standards

288 A *standard* is a set of guidelines, practices, or criteria developed by industry experts and
289 organizations to promote safety and consistency.[29] Industry standards complement and often
290 mirror the FMCSRs, providing widely recognized best practices that reinforce compliance and
291 enhance operational safety. These standards align closely with regulatory requirements, offering
292 practical tools for implementing effective safety programs and addressing common risks in
293 commercial motor vehicle operations. They encompass areas such as driver training, professional
294 certification, vehicle maintenance, operational practices, and risk management. Incorporating
295 these principles ensures a thorough assessment of the carrier's adherence to regulatory requirements
296 and their commitment to fostering safe and efficient practices. Examples of such standards
297 include those addressing out-of-service criteria, defensive driving practices, safe motor vehicle
298 operations, driver training, and certification programs.

299 Incorporating industry standards alongside the regulatory framework allows FMCSA to leverage
300 specialized expertise, ensure consistency across the industry, and respond more quickly to
301 emerging safety issues without requiring lengthy regulatory updates.[30] [31] This approach facilitates
302 a proactive rather than reactive stance on safety, addressing critical areas such as driver training,
303 fatigue management, vehicle maintenance, and cargo securement, thereby enhancing the overall
304 effectiveness of safety management practices and reducing crash risk.

305 The American Association of Motor Vehicle Administrators (AAMVA) plays a foundational
306 role in informing the standard of care for commercial motor vehicle (CMV) operations through

---

[29] Merriam-Webster, s.v. "Standard," accessed March 17, 2025, https://www.merriam-webster.com/dictionary/standard. ("Standard: something established by authority, custom, or general consent as a model or example.")
[30] Federal Motor Carrier Safety Administration, *Truck and Bus Safety Management Techniques: A Synthesis of Safety Practice*, FMCSA Publication No. FMCSA-MCRRR-07-006 (Washington, DC: U.S. Department of Transportation, February 2007).
[31] Federal Motor Carrier Safety Administration, *Industry Best Practices*, FMCSA (Washington, DC: U.S. Department of Transportation), accessed March 17, 2025, https://www.fmcsa.dot.gov/safety/good-business.

©W. Cody Middlebrook



307 the development of the Model Commercial Driver License (CDL) Manual.[32] [33] Under Cooperative

308 Agreement No. DTFH61-97-X-00017, the FMCSA worked closely with the AAMVA to

309 interpret and implement the knowledge and skills requirements outlined in 49 CFR Part 383.[34] [35] [36]

310 [37] These requirements set the minimum standards for commercial drivers to ensure safe and

311 compliant operation of CMVs, including hazard recognition, vehicle inspection procedures, and

312 adherence to safety regulations.

313 The FMCSA facilitated the development and distribution of the AAMVA Model CDL Manual,

314 to all state driver licensing agencies, ensuring consistency in the knowledge and skills required

315 for licensure. These manuals include detailed guidelines on the knowledge and skills drivers

316 must demonstrate, vehicle groupings, endorsements, and standardized testing procedures as

317 outlined in 49 CFR § 383.131.[38] [39] The FMCSA's involvement ensured the manuals accurately

318 reflected federal regulations while incorporating best practices for driver training and

319 qualification.

320 All 50 states have adopted the AAMVA Model CDL Manual as the basis for their own state

321 CDL manuals, creating uniformity in the education and certification of commercial drivers

322 nationwide. This ensures consistency in the standard of care expected of commercial drivers,

323 regardless of the state in which they are licensed.

---

[32] American Association of Motor Vehicle Administrators (AAMVA). (2017). *Commercial Driver License Manual: 2005 CDL Testing System*. Version: July 2017. Prepared under Cooperative Agreement No. DTFH61-97-X-00017 with the Federal Motor Carrier Safety Administration (FMCSA). Copyright © 2005 AAMVA.
[33] American Association of Motor Vehicle Administrators (AAMVA). (2022). *Commercial Driver's License Manual: Supplement for Modernized Version*. Version: September 9, 2022. Prepared under Cooperative Agreement No. DTFH61-97-X-00017 with the Federal Motor Carrier Safety Administration (FMCSA). Copyright © 2022 AAMVA.
[34] Cooperative Agreement No. DTFH61-97-X-00017: Federal Motor Carrier Safety Administration and AAMVA Agreement. This agreement outlines FMCSA's role in interpreting and implementing 49 CFR Part 383 knowledge and skill standards.
[35] 49 CFR 383.110 "General requirement."
[36] 49 CFR 383.111 "Required knowledge."
[37] 49 CFR 383.113 "Required skills."
[38] 49 CFR 383.131(a)(1) "A State must provide an FMCSA pre-approved driver information manual to a CLP or CDL applicant. The manual must be comparable to the American Association of Motor Vehicle Administrators' (AAMVA's) "2005 CDL Test System (July 2010 or newer Version) Model Commercial Driver Manual", which FMCSA has approved and provides to all State Driver Licensing Agencies…"
[39] 49 CFR 383.131(b)(1) "A State must provide an FMCSA pre-approved examiner information manual that conforms to model requirements in paragraphs (b)(1)(i-xi) of this section to all knowledge and skills test examiners. To be pre-approved by FMCSA, the examiner information manual must be comparable to AAMVA's "2005 CDL Test System (July 2010 or newer Version) Model CDL Examiner's Manual," which FMCSA has approved and provides to all State Driver Licensing Agencies…"

©W. Cody Middlebrook



While the FMCSRs provide a regulatory framework for applicable vehicles, the following industry standards, among others, help inform the Standard of Care for professional fleet operations in the United States:

**ANSI/ASSP Z15.1:** This standard defines the requirements for a comprehensive "Fleet Safety Program." It establishes that any organization using vehicles for business purposes has an obligation to manage driver behavior, regardless of whether those drivers require a CDL.

**NATMI Standards:** According to the North American Transportation Management Institute (NATMI), "Safety programs... are a social necessity of a motor fleet." NATMI emphasizes that a motor carrier has moral and social responsibilities toward the public that "go beyond business considerations and regulatory compliance."

**FMCSA Best Practices:** The FMCSA's own "Non-Regulatory Safety Practices" report highlights that "safety practices" are essential for all motor carriers to achieve the mission of preventing crashes, fatalities, and injuries.

**Professional Defensive Driving:** Programs such as the Smith System and the National Safety Council's Defensive Driving Course establish the universal standard for "Defensive Driving." These standards require a driver to do everything reasonably possible to avoid a collision, regardless of the actions of others or the specific legal right-of-way.

*4.6 Application for This Analysis*

The regulatory framework, industry standards, and certifications discussed in this report provide the foundation for evaluating the safety and operational responsibilities of FLYWAY/DHL in connection with the collision. By aligning the FMCSRs with industry-recognized best practices, this analysis examines whether FLYWAY/DHL met the established standards required to ensure safety and compliance.

This framework enables a review of FLYWAY/DHL's adherence to driver qualification processes, vehicle maintenance programs, hours-of-service requirements, and overall safety management controls. In evaluating the actions of their driver(s), this report considers multiple

©W. Cody Middlebrook



349  authoritative standards, including the AAMVA Model CDL Manual, Tennessee State Driver's

350  Manual, defensive driving principles, and other industry-recognized practices that inform safe

351  commercial vehicle operation. These standards collectively provide a basis for assessing whether

352  FLYWAY/DHL driver(s') actions aligned with the expectations of a prudent fleet driver.

353  Through this analysis, any deficiencies in compliance, safety management, or operational

354  practices are identified and assessed for their contribution to the conditions that led to the

355  collision. This structured approach connects FLYWAY/DHL and their driver(s') actions and/or

356  inactions to their broader obligations to uphold safety in fleet operations.

*4.7 Corporate Safety Oversight of Mixed-Fleet Operations*



357

358  **Figure 3:** *ANSI Z15.1 "Safe Practices for Motor Vehicle Operations"*

359  Professional fleet safety is a management function independent of vehicle weight or "CMV"

360  status. Industry standards (including ANSI/ASSP Z15.1, NATMI Principles, and the NSC Motor

361  Fleet Safety Manual)[40] establish a unified standard of care for all commercial-use vehicles. This

---

[40] American Society of Safety Engineers (ASSE). (2017). ANSI/ASSE Z15.1-2017: Safe Practices for Motor Vehicle Operations. American National Standards Institute (ANSI).

©W. Cody Middlebrook



362  standard requires proactive vetting, training, and supervision to ensure "Defensive Driving"

363  (doing everything reasonable to avoid a collision). Operationally, a professional carrier does not

364  maintain a lower safety expectation for non-regulated vehicles; instead, it must apply a consistent

365  safety culture to ensure core protocols, such as the Smith System and FMCSA Non-Regulatory

366  Safety Practices, are engaged to mitigate foreseeable risks to the public.[41]

## 5. Analysis and Findings

### 5.1 Subject Collision

367  On May 20, 2024, at approximately 19:01, at or near Winchester Road, 20 feet west of Cargo

368  Road, in Shelby County, Memphis, Tennessee, two commercial vehicles identified as DHL

369  trucks were engaged in "speed racing" or "street racing" while traveling on Winchester Road.

370  According to the police narrative, one of these trucks struck a third-party vehicle (a 2011

371  Chevrolet Malibu), which was then forced into a collision with the Plaintiff's vehicle. The

372  commercial driver involved reportedly fled the scene without providing identification or

373  rendering aid.[42]



374

375  ***Figure 4:*** *Narrative from Master Record Number #300958158.*

376

---

[41] Federal Motor Carrier Safety Administration (FMCSA). (2007). Commercial Motor Vehicle Non-Regulatory Safety Practices: Report from Workgroup on Task 07-02 to the Motor Carrier Safety Advisory Committee. U.S. Department of Transportation.
[42] Note: The writer of this report does not necessarily adopt the police officer's narrative of the collision and is using it for descriptive purposes only.

©W. Cody Middlebrook





377

378    ***Figure 5:*** *Diagram from Master Record Number #300958158.*

379    As a result of this collision, investigating officer Irma Montes with the Memphis Police

380    Department, awarded an unknown DHL vehicle with a contributing factor of "Careless Erratic

381    Driving," and "Driver and Vehicle Left Scene."

382    At the time of the collision, it is alleged the FLYWAY/DHL driver(s) was/were engaged in the

383    operation of a CMV under the authority and direction of FLYWAY/DHL, performing duties

384    within the course and scope of his employment.

*5.2 Motor Carrier Analysis (FLYWAY)*

385    FLYWAY is a USDOT-registered interstate motor carrier (USDOT #808040), authorized for

386    hire (MC-364259). The company operates from 6430 Hurt Rd, Horn Lake, Mississippi 38637,

387    and has authority to transport General Freight. As a USDOT-registered motor carrier, FLYWAY

388    is subject to compliance with the FMCSRs. According to data filed with the FMCSA through the

389    biennial MCS-150 form, dated 08/12/2024, FLYWAY reported operating 20 power units,

390    employing 10 drivers, and traveling 300,000 miles in 2023. Additionally, information retrieved

©W. Cody Middlebrook

391  from the FMCSA's SAFER website indicates that, over a 24-month period from 01/28/2024 to

392  01/28/2026, FLYWAY underwent 15 inspections. During this period, the carrier recorded a

393  driver out-of-service (OOS) rate of 6.7% and a vehicle OOS rate of 20%, compared to national

394  averages of 6.67% and 22.26%, respectively. The OOS rates for FLYWAY are above the

395  national average for drivers.

| Inspection Type | Vehicle | Driver |
|---|---|---|
| Inspections | 10 | 15 |
| Out of Service | 2 | 1 |
| Out of Service % | 20% | 6.7% |
| Nat'l Average % as of DATE 12/26/2025* | 22.26% | 6.67% |

396

397  ***Figure 6:*** *FLYWAY's US Inspection results for 24 months prior to 01/28/26.*

| | | | | | |
|---|---|---|---|---|---|
| **Driver Inspections with Unsafe Driving Violations:** 5 | | **Driver Inspections:** 15 | **Vehicle Inspections:** 10 | **Driver Inspections:** 15 | **Driver Inspections:** 15 |
| **Safety Event Group:** 5-8 driver inspections with Unsafe Driving Violations | NOT PUBLIC | with HOS Compliance **Violations:** 0 | with Vehicle Maint. **Violations:** 6 | with Drugs/Alcohol **Violations:** 0 | with Driver Fitness **Violations:** 2 |
| **Avg. PU × UF:** 20 | | **Safety Event Group:** 11-20 relevant driver inspections | **Safety Event Group:** 5-10 relevant vehicle inspections | **Safety Event Group:** No Safety Event Grouping | NOT PUBLIC | **Safety Event Group:** 11-20 relevant driver inspections |
| **Segment:** Straight Carrier | | | | | |

398

399  ***Figure 7:*** *FLYWAY's US Inspection violation results for 24 months prior to 01/28/26.*

400  As of the date of this report, FLYWAY does not have an FMCSA-assigned safety rating. Motor

401  carriers without a safety rating are considered "unrated," which means they have not undergone a

402  compliance review or safety audit that results in an official FMCSA safety fitness determination.

403  Although unrated carriers are not automatically deemed non-compliant, the absence of a safety

404  rating limits the availability of federal assessments regarding their adherence to the FMCSRs.

©W. Cody Middlebrook



405  FLYWAY had a non-ratable review dated 11/13/20. A non-ratable review is a targeted

406  compliance intervention or focused investigation that evaluates specific areas of a carrier's

407  operation (such as Hours of Service or Vehicle Maintenance) without performing the

408  comprehensive audit required to issue or update a federal safety fitness rating.

*5.3 Motor Carrier Analysis (DHL)*

409  DHL is a USDOT-registered interstate motor carrier (USDOT #315026), authorized for hire

410  (MC-123343). The company operates from 236 Wendell H. Ford Blvd – MS 1305, Erlanger, KY

411  41018, and has authority to transport General Freight. As a USDOT-registered motor carrier,

412  DHL Express (USA), Inc. is subject to compliance with the FMCSRs. According to data filed

413  with the FMCSA through the biennial MCS-150 form, dated 05/31/2024, DHL Express (USA),

414  Inc. reported operating 481 power units, employing 2,837 drivers, and traveling 6,347,445 miles

415  in 2023.

416  Additionally, information retrieved from the FMCSA's SAFER website indicates that, over a 24-

417  month period from 01/28/2024 to 01/28/2026, DHL Express (USA), Inc. underwent 192

418  inspections. During this period, the carrier recorded a driver out-of-service (OOS) rate of 2.6%

419  and a vehicle OOS rate of 13.2%, compared to national averages of 6.67% and 22.26%,

420  respectively. The OOS rates for DHL Express (USA), Inc. are below the national averages.



| Inspection Type | Vehicle | Driver |
|---|---|---|
| Inspections | 121 | 192 |
| Out of Service | 16 | 5 |
| Out of Service % | 13.2% | 2.6% |
| Nat'l Average % as of DATE 12/26/2025* | 22.26% | 6.67% |

421

422  ***Figure 8:*** *DHL's US Inspection results for 24 months prior to 01/28/26.*

©W. Cody Middlebrook





423

424    ***Figure 9:*** *DHL's US Inspection violation results for 24 months prior to 01/28/26.*

425    As of the date of this report, DHL has an FMCSA-assigned safety rating of "Satisfactory," as a

426    result of compliance review dated 05/30/95, nearly 30 years ago. A satisfactory safety rating

427    indicates that a compliance review concluded, at the time of the review, the motor carrier has

428    adequate safety management controls in place to meet the safety fitness standard prescribed in 49

429    CFR Part 385.

430    DHL had a non-ratable review dated 06/05/24. A non-ratable review is a targeted compliance

431    intervention or focused investigation that evaluates specific areas of a carrier's operation (such as

432    Hours of Service or Vehicle Maintenance) without performing the comprehensive audit required

433    to issue or update a federal safety fitness rating.

*5.4 Knowledge and Compliance*

434    When FLYWAY/DHL applied for and received their USDOT number, they certified their

435    understanding of and commitment to comply with the FMCSRs. By obtaining a USDOT

436    number, FLYWAY/DHL also agreed to establish safety management controls to monitor and

437    maintain compliance with these regulations, demonstrating their responsibility to prioritize safety

438    in all aspects of their commercial motor vehicle operations.[43]

---

[43] 49 CFR 385.3 | "Safety management controls means the systems, policies, programs, practices, and procedures used by a motor carrier to ensure compliance with applicable safety and hazardous materials regulations which ensure the safe movement of products and passengers

©W. Cody Middlebrook



439    Under 49 CFR § 390.3(e), a motor carrier is required to ensure compliance with the FMCSRs for

440    all aspects of their operations.[44] This regulation emphasizes that motor carriers are responsible for

441    the actions of their drivers, employees, and agents when performing tasks related to the carrier's

442    business. Additionally, 49 CFR § 390.11 explicitly places responsibility on motor carriers to

443    require observance of the FMCSRs by their employees, including drivers, as part of their

444    operational oversight.[45]

445    FLYWAY provides "last mile services" for DHL as established by a formal Cartage Agreement.

446    Under this business relationship, FLYWAY drivers operate trucks to fulfill delivery and pick-up

447    assignments.[46]

448    A review of the Cartage Agreement would be necessary to evaluate the overall safety posture of

449    this agreement.

450    Under FLYWAY's driver qualification process, according to its own statements, involves

451    conducting background checks and requiring all drivers to pass a drug test prior to the start of

452    their employment. The company also claims that new hires must complete a safety training suite

453    encompassing defensive driving using the Smith5Keys, dangerous goods handling, and various

454    air-cargo security protocols. Performance is reportedly monitored through daily debriefs with

455    managers to evaluate safety and compliance. While these are the procedures FLYWAY has

456    stated are in place, a formal determination of their adequacy or actual implementation would

457    require a thorough review of the underlying materials and records. As of the writing of this

---

through the transportation system, and to reduce the risk of highway accidents and hazardous materials incidents resulting in fatalities, injuries, and property damage."

[44] 49 CFR 390.3(e) | "(1) Every employer shall be knowledgeable of and comply with all regulations contained in this subchapter that are applicable to that motor carrier's operations. (2) Every driver and employee involved in motor carrier operations shall be instructed regarding, and shall comply with, all applicable regulations contained in this subchapter. (3) All motor vehicle equipment and accessories required by this chapter shall be maintained in compliance with all applicable performance and design criteria set forth in this subchapter."

[45] 49 CFR 390.11 | "Whenever in part 325 of subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition. If the motor carrier is a driver, the driver shall likewise be bound."

[46] Defendant Flyway Express, LLC's Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents , Mary L. Warren v. Flyway Express, LLC, et al., Case No. 2:25-cv-02588-SHL-tmp , United States District Court for the Western District of Tennessee (Sept. 2, 2025) .

©W. Cody Middlebrook



458  report, no such documentation has been provided and the individual driver(s) involved in the

459  incident have not been identified.

To the extent that a response is necessary, Flyway provides safety training to all of its drivers as part of its new hire process. This includes required training courses on defense driving and driver safety using the Smith5Keys, dangerous goods, certified cargo screening

460

facilities, security threat assessment, the indirect air carrier standard security program, and the full air-cargo aircraft operator standard security program.  Flyway supervises its drivers by evaluating the performance at the end of the driver's daily route.

461

To the extent that a response is necessary, Flyway states that the vehicles are rotated between its drivers based on the mileage of daily routes in order to maintain even mileage on the vehicles.

462

463  **Figures 10, 11, & 12:** *FLYWAY's answers to plaintiff's interrogatories.*

464

©W. Cody Middlebrook

**7.2  Incident Review and Analysis.**

A process shall be developed to systematically review and analyze incidents. The objective of this process is to identify the root causes and contributing factors that led to the incident, leading to corrective and preventive actions.

465

466      ***Figures 13:*** ANSI/ASSE Z15.1-2017 *Section 7.2 "Incident Review and Analysis."*

467    FLYWAY stated that vehicles are rotated between drivers based on the mileage of daily routes to

468    ensure even wear across the flee and drivers are supervised/evaluated daily on performance

469    metrics including safety, efficiency, and timeliness during a debrief process with a manager.

470    FLYWAY's stated procedures strongly imply the use of telematics systems. In my professional

471    opinion, these records likely contain the objective GPS and operational logs necessary to identify

472    the driver(s) involved in the collision. While FLYWAY claims it cannot identify the personnel

473    involved, a formal determination of these operational statements requires a thorough review of

474    the raw electronic data, which as of the writing of this report, has not been provided.

*5.5 Driver Analysis*

475    This evaluation is based on a review of the Tennessee Uniform Traffic Crash Report (Master

476    Record #300958158), the Plaintiff's Complaint, and available discovery documents as of this

477    date. I have not yet reviewed the specific telematics data, or deposition testimony of the

478    defendant drivers, as the identities of the specific FLYWAY driver(s) involved have not yet been

479    disclosed by the Defendant.

480    This analysis assumes the accuracy of the collision narrative provided by the investigating

481    officer and the statements of the involved parties which identified that two DHL-branded vans

©W. Cody Middlebrook



482 operated by FLYWAY personnel were engaged in a speed contest or "racing" immediately prior

483 to the collision. If these facts are substantiated, the following analysis details the significant

484 deviations from the standard of care as established by the Tennessee Comprehensive Driver

485 License Manual, the Smith System of defensive driving (on which FLYWAY admits training its

486 drivers), and the ANSI/ASSE Z15.1 standard for motor vehicle safety.

*5.5.1 Tennessee Comprehensive Driver License Manual*



487

488 **Figures 14 & 15:** *The Basic Speed Rule and Principals of the Basic Speed Rule from the*

489 *Tennessee Comprehensive Driver License Manual.*

©W. Cody Middlebrook



**Figure 16:** *Tennessee Speed Laws from the Tennessee Comprehensive Driver License Manual.*

Tennessee driver standards dictate that speed must be "careful and prudent" and adjusted for conditions. By engaging in a contest of speed, the driver violated the fundamental requirement to maintain a speed that is "reasonable and proper" for the traffic volume and roadway conditions. These actions indicate a disregard for the safety of the motoring public.

©W. Cody Middlebrook





8. Manslaughter/vehicular homicide involving the operation of a vehicle.

9. Two reckless driving violations within 12 months.

10. Drag racing.

11. Habitual recipients of moving traffic violations.

12. Not complying with the terms of a judgment found against the driver for damages resulting from a motor vehicle crash.

*Figures 17 & 18: "Losing Your Privilege to Drive" from the Tennessee Comprehensive Driver License Manual.*

The manual explicitly categorizes "Drag Racing" and "Reckless Driving" as major offenses carrying heavy point penalties and potential license revocation. The act of racing inherently violates the duty to drive with "due care" and constitutes a "willful or wanton disregard for the safety of persons or property."

## ROAD RAGE

Aggressive driving – tailgating, honking, fist and hand gestures, yelling, speeding, cutting off other drivers, and more frightening, the use of firearms- has become a real danger on America's highways. The National Highway Traffic Safety Administration (NHTSA) says about 66% of all traffic fatalities annually are caused by aggressive driving behaviors, such as passing on the right, running red lights and tailgating. Law enforcement and insurance companies are getting much tougher on aggressive drivers.

*Figure 19: "Road Rage" from the Tennessee Comprehensive Driver License Manual.*

©W. Cody Middlebrook



506    The manual identifies "speeding, cutting off other drivers, and more." as aggressive driving

507    behaviors that lead to fatalities. Engaging in a street race fits the manual's description of driving

508    behavior that endangers the public.

> **Traffic Crashes**
>
> **If You Are Involved In a Crash — STOP!** The law requires drivers of vehicles involved in a crash to stop immediately at the scene, or as close to the scene as possible without obstructing traffic. Turn off the ignition in the damaged vehicle to prevent a fire. If the car is on fire, help the people out and take them away from the vehicle to prevent further injury in case of an explosion.
>
> **"Notify the police immediately by calling 911."** It is very important to report the crash to the police as quickly as possible. Motor vehicle crashes involving property damage, personal injury or death must be reported to the police. Remain calm and stay at the crash scene.

509

510    ***Figure 20:*** *"Traffic Crashes" from the Tennessee Comprehensive Driver License Manual.*

511    According to the Tennessee Comprehensive Driver License Manual, "The law requires drivers of

512    vehicles involved in a crash to stop immediately at the scene." The allegation that the FLYWAY

513    driver(s) (Vehicle #1) fled the scene after striking Vehicle #2 is a violation of the most

514    fundamental post-collision responsibility mandated by the state.

### 5.5.2 Smith System 5 Keys

515    FLYWAY has admitted to training its drivers on the Smith System, a recognized industry

516    standard for defensive driving. The alleged behavior of street racing is antithetical to every

517    principle of this system.

518

©W. Cody Middlebrook



### KEY TWO.
### GET THE BIG PICTURE.®

**To make the right decisions, your information must be complete. The information you need lies not only 15 seconds ahead, but all around you. Use your eyes to establish a 360-degree circle of constant awareness.**

#### Introduction

Adequate eye-lead time is only one of the seeing habits needed to acquire the vast amount of information that exists in the traffic scene. The Big Picture includes everything you can possibly see ahead, to the rear, and to the sides during every second of your progress. Proper seeing habits must obviously include *frequent use of your mirrors*. But they should also lead to certain *thinking* habits, which then lead to safer *driving* habits.

#### Calculating Proper Following Distance

If you insist on removing vision barriers, you will automatically establish increased following distance. To determine how much space you should maintain, use this formula: FOR SPEEDS UP TO 40 MPH, YOU SHOULD HAVE ONE SECOND FOR EVERY TEN FEET OF VEHICLE LENGTH. For example, to calculate a minimum proper following distance for a 40 ft vehicle traveling at 30 mph, count four seconds: one thousand one . . . one thousand two . . . one thousand three . . . one thousand four. Start counting when the rear of the vehicle ahead passes a fixed reference point such as a bridge (FIGURE 3). If you reach the bridge in less than four seconds, you're following too closely. FOR SPEEDS OVER 40 MPH, YOU ADD ONE SECOND. Four seconds should be considered an absolute minimum following distance.

This Department Of Transportation rule relates to

519

***Figure 21:*** *"Key 2 – Get The Big Picture" from the Smith System 5 Keys.*

"Key 2 – Get The Big Picture." This key requires drivers to establish a "360-degree circle of constant awareness". Drivers engaged in a race typically succumb to "low-aim steering," focusing narrowly on the competitor vehicle rather than the full traffic environment. Based on the circumstances, the FLYWAY/DHL driver(s) failed to account for the presence of WADE and WARREN, treating them as obstacles rather than relevant hazards.

©W. Cody Middlebrook



KEY FOUR.
# LEAVE YOURSELF AN OUT.®

*Using your eyes properly gives you time to make decisions. In addition to time, you need space. Space is your out. It's a cushion, and an escape route, from the seen and the unforeseen.*

### Introduction

The first three Smith System Keys can keep you well aware of your driving environment. But awareness is of no value unless you have a way to escape from impending traffic hazards. That's why you must also work to use the Key called LEAVE YOURSELF AN OUT.®

**The Space Cushion: A Way Out of Trouble**

increases your ability to deal with the unexpected and to prevent the ultimate surprise: an accident.

The safest position in traffic is where few or no objects surround you. The objective is to surround yourself with *space* (FIGURE 6). If you build a space cushion around your vehicle, you can cushion yourself against conflicts. When your space cushion becomes smaller because someone has entered it, learn to feel uncomfortable—then adjust your speed or position to regain the lost space. Cushioning yourself and learning to feel uncomfortable when crowded are two very important thinking habits to develop.

**The Key #4 Technique for Preventing Accidents.**

- Build a space cushion all around your vehicle—to the front, rear, and sides.

526

527     ***Figure 22:*** *"Key 4 – Leave Yourself an Out" from the Smith System 5 Keys.*

528     The Smith System emphasizes building a :space cushion" to allow for an escape route. Racing

529     involves intentionally closing gaps and removing space cushions to prevent being overtaken. By

530     driving aggressively in close proximity to other traffic, the FLYWAY/DHL drivers voluntarily

531     removed their "out," making the collision inevitable when traffic conditions changed.

©W. Cody Middlebrook





532

**Figure 23:** *"Key 5 – Make Sure They See You" from the Smith System 5 Keys.*

534    This principle is about establishing eye contact and communicating intentions to ensure safety.

535    While racing drivers certainly draw attention, they do so erratically. They fail to send "timely,

536    effective warnings" of their maneuvers, leaving other motorists like WADE and WARREN

537    unable to predict their actions or avoid the collision.

*5.5.3 ANSI/ASSE Z15.1-2017*

538    The ANSI/ASSE Z15.1-2017 standard defines safe practices for motor vehicle operations. The

539    alleged actions violate the core definitions and driver responsibilities outlined in this consensus

540    standard.

541

©W. Cody Middlebrook



> **2.2   Aggressive Driving.**
> Driving in a selfish, bold or pushy manner without regard for the rights or safety of other users of the roadway.

542

**Figure 24:** ANSI/ASSE Z15.1-2017 *Section 2.2 "Aggressive Driving."*

544 The standard defines aggressive driving as "driving in a selfish, bold or pushy manner without
545 regard for the rights or safety of other users of the roadway". Street racing is a clear example
546 definition of this prohibited behavior.

> **7.1.2   Driver Responsibilities.**
> The driver shall be required to report all motor vehicle incidents to the organization, regardless of severity.

547

**Figure 25:** ANSI/ASSE Z15.1-2017 *Section 7.1.2 "Driver Responsibilities."*

549 The standard requires that "The driver shall be required to report all motor vehicle incidents to
550 the organization, regardless of severity." Fleeing the scene precludes immediate reporting and
551 violates the organizational safety policy expected of a professional fleet driver.

*5.6 Preventability*

552 A preventable accident/incident, as defined by the National Safety Council (NSC) defines a
553 preventable accident as:

554

©W. Cody Middlebrook



555 　　　Any incident involving a commercial motor vehicle which results in property damage or
556 　　　personal injury—regardless of who was injured, what property was damaged, to what
557 　　　extent, or where it occurred—in which the driver in question failed to exercise reasonable
558 　　　precaution to prevent the incident.[47]

559 A preventable collision, as defined by the ANSI/ASSE Z15.1 defines a preventable collision as:

560 　　　A preventable collision is one in which the driver failed to take reasonable actions or
561 　　　precautions to avoid.[48]

562 Both standards emphasize that a professional driver is responsible for anticipating hazards and

563 taking defensive actions to prevent crashes.[49] In judging whether the driver's actions were

564 reasonable, one seeks to determine whether the driver drove defensively and demonstrated an

565 acceptable level of skill and knowledge. This was a preventable collision, attributable to the

566 FLYWAY/DHL driver(s) as discussed above.

## 6. Opinion(s)

567 The following opinions are based on the analysis of the materials reviewed, as outlined in the

568 previous sections, and my professional expertise in commercial motor vehicle safety, fleet safety,

569 compliance, and operational standards. These opinions are offered within a reasonable degree of

570 probability in the field of motor carrier safety, fleet safety, regulatory compliance, and

571 operational oversight, and reflect my assessment of the facts and circumstances relevant to this

572 case. These conclusions are grounded in a rigorous qualitative analysis of compliance data and

573 industry standards, supported by over a decade of expertise.

574 The following opinions are based on the analysis of the documents currently available,

575 specifically the Tennessee Uniform Traffic Crash Report (Master Record #300958158) and the

576 allegations set forth in the Plaintiff's Complaint.

---

[47] National Safety Council (NSC), *Preventable Accident Criteria*.
[48] ANSI/ASSE Z15.1-2017, Safe Practices for Motor Vehicle Operations, American Society of Safety Engineers (Park Ridge, IL, 2017).
[49] The FMCSRs define the term "accident" with specificity, establishing when an event involving a commercial motor vehicle meets the regulatory threshold. However, industry stakeholders often describe such events using a range of terms, including accident, incident, crash, or collision.

©W. Cody Middlebrook



577  This analysis assumes the accuracy of the collision narrative provided by the investigating

578  officer and the sworn statements of the involved parties (specifically that two DHL-branded vans

579  operated by FLYWAY personnel were engaged in a speed contest immediately prior to the

580  collision and that one driver subsequently fled the scene.) Should further discovery regarding the

581  drivers' identities, electronic data, or actions contradict these foundational facts, I reserve the

582  right to amend these opinions accordingly.

583  • **Opinion 1:** FLYWAY/DHL and its driver(s) caused and/or contributed to the cause

584  of the collision by engaging in high-risk driving behaviors, specifically the alleged act

585  of street racing, which directly violates the Tennessee Comprehensive Driver License

586  Manual's "Basic Speed Rule" and prohibitions against "Drag Racing" and "Reckless

587  Driving."

588  • **Opinion 2:** The actions of the FLYWAY/DHL driver(s), specifically engaging in a

589  speed contest and subsequently fleeing the scene, demonstrated a conscious disregard

590  for safe operations and the safety of other motorists, violating the fundamental safe

591  driving principles, as outlined above.

592  • **Opinion 3:** FLYWAY/DHL failed to implement and maintain adequate safety

593  management controls necessary to ensure driver compliance with applicable safety

594  standards and corporate safety policies. The alleged conduct suggests a systemic

595  failure in the carrier's supervision and monitoring of driver behavior, particularly

596  regarding the prohibition of aggressive driving and the requirement to report incidents

597  immediately.

598  • **Opinion 4:** The FLYWAY/DHL driver(s) failed to meet the expected knowledge and

599  skill level for a professional commercial vehicle/fleet driver at the time of the

600  collision. A prudent professional driver would have recognized the inherent danger of

601  racing and the legal obligation to stop at the scene of a crash, as mandated by state

602  law and industry standards.

603  • **Opinion 5:** FLYWAY/DHL likely possesses, or should possess, electronic data

604  (telematics) capable of identifying the specific driver(s) and vehicle(s) involved in the

605  collision, consistent with their stated operational procedures for mileage tracking and

©W. Cody Middlebrook



606    daily performance debriefs. Failure to produce this data hinders the ability to fully
607    assess driver identity and safety compliance.

608    • **Opinion 6:** This was a preventable accident/collision, attributable to the
609    FLYWAY/DHL and/or their driver(s), as discussed above.

## 7. Conclusion

610    Subject to the limitations regarding the confirmation of specific driver identity, the analysis and
611    opinions presented in this report demonstrate that FLYWAY/DHL and its driver(s) failed to meet
612    the applicable safety and compliance standards, contributing to the conditions that led to the
613    collision. Predicated on the accuracy of the reported events, these deficiencies reflect a departure
614    from the expected standard of care in commercial vehicle/fleet operations and increased the risk
615    to public safety.

616    I reserve the right to amend or supplement this report should additional information become
617    available.

Respectfully submitted,

W. Cody Middlebrook

Transportation Safety and Compliance Consultant

©W. Cody Middlebrook



## 8. Appendices

8.1 Appendix A: Materials Reviewed

8.2 Appendix B: Bibliography

8.3 Appendix C: CV

8.4 Appendix D: Supporting Documents

618

©W. Cody Middlebrook



*8.1 Appendix A: Materials Reviewed*

| |
|---|
| 📕 Accident Report |
| 📕 Defendant Flyway Express LLC's Responses to Plaintiffs First Set of Interr... |
| 📕 Defendant Flyway Express LLC's Responses to Plaintiffs First Set of Interr... |
| 📕 Ex 1 - Memphis Police Department Crash Report |
| 📕 Ex2 - Incident Photos |
| 📕 FILED Complaint 5.6.25 |
| 📕 Mary Warren PR |
| 📕 Warren - Defendants Rule 26 Initial Disclosures |
| 📕 Warren, Mary L Investigative Sweep |

©W. Cody Middlebrook



*8.2 Appendix B: Bibliography*

**American Association of Motor Vehicle Administrators (AAMVA).** (2017). *Commercial Driver License Manual: 2005 CDL Testing System.* Version: July 2017. Prepared under Cooperative Agreement No. DTFH61-97-X-00017 with the Federal Motor Carrier Safety Administration (FMCSA). Copyright © 2005 AAMVA.

**American Association of Motor Vehicle Administrators (AAMVA).** (2022). *Commercial Driver's License Manual: Supplement for Modernized Version*. Version: September 9, 2022. Prepared under Cooperative Agreement No. DTFH61-97-X-00017 with the Federal Motor Carrier Safety Administration (FMCSA). Copyright © 2022 AAMVA.

**American Association of Motor Vehicle Administrators (AAMVA).** (2022). *Model Driver's License Manual.* August 2022 Edition. Copyright © 2022 AAMVA.

**American National Standards Institute (ANSI).** (2017). *Manual on Classification of Motor Vehicle Traffic Crashes: ANSI D.16-2017 (8th Edition).* Prepared by the Association of Transportation Safety Information Professionals (ATSIP). Approved December 18, 2017.

**American Society of Safety Engineers (ASSE).** (2017). *ANSI/ASSE Z15.1-2017: Safe Practices for Motor Vehicle Operations.* American National Standards Institute (ANSI).

**American Transportation Research Institute (ATRI).** (2008). *Driver Training Impacts on Safety: A Technical Analysis.* Arlington, VA: American Transportation Research Institute.

**American Transportation Research Institute (ATRI).** (2018). *Predicting Truck Crash Involvement: 2018 Update.* Arlington, VA: American Transportation Research Institute.

**American Trucking Associations (ATA).** (2017). *Trucking Industry Guidelines for Recording Fleet Motor Vehicle Accidents and Determining Preventability.* Developed by the ATA Safety Management Council's Accident Review Committee. Arlington, VA: American Trucking Associations.

©W. Cody Middlebrook



**Cefic, ECTA, Fecc.** (2015). *Guidelines for Investigating Logistics Incidents and Identifying Root Causes.* Issue 1. Published collaboratively by the European Chemical Industry Council (Cefic), European Chemical Transport Association (ECTA), and the European Association of Chemical Distributors (Fecc).

**Commercial Vehicle Safety Alliance (CVSA).** (2013). *North American Standard Out-of-Service Criteria.* Rev. April 1, 2013. Greenbelt, MD: Commercial Vehicle Safety Alliance.

**Commercial Vehicle Safety Alliance (CVSA).** (n.d.). *North American Standard Truck Inspection Procedure.* Commercial Vehicle Safety Alliance.

**Federal Highway Administration (FHWA).** (1985). *Model Curriculum for Training Tractor-Trailer Drivers: Administrator's Manual and Instructor's Manual.* U.S. Department of Transportation, Bureau of Motor Carrier Safety.

**Federal Highway Administration (FHWA).** (1996). *Commercial Motor Vehicle Driver Fatigue and Alertness Study: Technical Summary.* Publication No. FHWA-MC-97-001. U.S. Department of Transportation.

**Federal Highway Administration (FHWA).** (1997). *Commercial Vehicle Preventable Accident Manual: A Guide to Countermeasures (3rd Edition).* Prepared by S. Carl Uzgiris, Crispin Hales, Michael A. Dilich, and Kenneth L. d'Entremont. U.S. Department of Transportation.

**Federal Highway Administration (FHWA).** (1997). *On Guard: Insights into Commercial Driver Qualifications.* Publication No. FHWA-MC-97-004. U.S. Department of Transportation, Office of Motor Carriers.

**Federal Highway Administration (FHWA).** (1999). *Commercial Driver's License Effectiveness Study.* Publication No. FHWA-MCRT-99-012. U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2005). *Form MCS-150A: Safety Certification for Application for U.S. DOT Number.* OMB No. 2126-0013. U.S. Department of Transportation.

©W. Cody Middlebrook



**Federal Motor Carrier Safety Administration (FMCSA).** (2005-2006). *Large Truck Crash Causation Study (LTCCS): Methodology, Report to Congress, and Codebook.* Publications No. FMCSA-A-RI-05-035 and FMCSA-MC-R/MC-RRA. U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2007). *Commercial Motor Vehicle Non-Regulatory Safety Practices.* Report from Workgroup on Task 07-02 to the Motor Carrier Safety Advisory Committee. U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2008-2010). *Large Truck and Bus Crash Facts: 2008-2010.* Analysis Division. U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2009). *A Motor Carrier's Guide to Improving Highway Safety.* U.S. Department of Transportation, Education and Technical Assistance Program.

**Federal Motor Carrier Safety Administration (FMCSA).** (2009-2011). *Large Truck Crash Overview Reports: 2009, 2010, and 2011.* Analysis Division, U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2015). *Unified Registration System (URS) Training*. Washington, DC: U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2016). *Corrective Actions and Performance Requirements for Acute and Critical Violations.* Winter 2016. U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2016). *Notice of Proposed Rulemaking: Minimum Training Requirements for Entry-Level Commercial Motor Vehicle Operators.* Federal Register, Vol. 81, No. 44, Docket No. FMCSA-2007-27748.

**Federal Motor Carrier Safety Administration (FMCSA).** (2018). *Electronic Field Operations Training Manual (eFOTM): Administration Manual.* U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2018). *Safety Audit Resource Guide.* Revised Edition, July 26, 2018. U.S. Department of Transportation.

©W. Cody Middlebrook



**Federal Motor Carrier Safety Administration (FMCSA).** (2020). *Commercial Driver Safety Risk Factors.* Report No. FMCSA-RRR-17-014b. U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2022). *Electronic Field Operations Training Manual (eFOTM): Compliance Manual.* U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2022). *Electronic Field Operations Training Manual (eFOTM): Inspection Manual.* U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2022). *Electronic Field Operations Training Manual (eFOTM): Safety Audit Manual.* U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2022). *National Commercial Driver's License (CDL) Program Training Manual.* U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2022). *Carrier Compliance Questionnaire.* Washington, DC: U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2023). *Assessment of Commercial Driver's License (CDL) Holders' Traffic Violations, Convictions, and Disqualifications.* U.S. Department of Transportation, John A. Volpe National Transportation Systems Center.

**Federal Motor Carrier Safety Administration.** (2023). *2023 Pocket Guide to Large Truck and Bus Statistics.* Washington, D.C.: U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2024). *Federal Motor Carrier Safety Regulations (FMCSRs): Parts 300-399*. U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (2024). Safety Measurement System (SMS) Methodology: Behavior Analysis and Safety Improvement Category (BASIC) Prioritization Status. Version 3.19. U.S. Department of Transportation.

©W. Cody Middlebrook



**Federal Motor Carrier Safety Administration (FMCSA).** (2025). *MCS-90 Endorsement for Motor Carrier Policies of Insurance for Public Liability.* Washington, DC: U.S. Department of Transportation.

**Federal Motor Carrier Safety Administration (FMCSA).** (n.d.). *Accident Countermeasures Manual: A Guide for Improving Motor Carrier Safety.* U.S. Department of Transportation. Retrieved from [FMCSA Publications].

**Gupta, S., Olson, R., & Hanowski, R.** (2009). *Defensive Driving Tips for CMV Drivers: An Internet-Based Approach.* FMCSA Report No. FMCSA RRT-09-003. U.S. Department of Transportation, Federal Motor Carrier Safety Administration.

**J. J. Keller & Associates, Inc.** (2014). CSA Guide for Commercial Motor Vehicle Fleets: Your Complete Guide to Compliance, Safety, Accountability (CSA), Successful Roadside Inspections, and Positive Safety Evaluations. Neenah, WI: J. J. Keller & Associates, Inc.

**J. J. Keller & Associates, Inc.** (2014). FMCSA Compliance Manual: Comprehensive Guide for Carrier Safety and Federal Motor Carrier Safety Regulations. Neenah, WI: J. J. Keller & Associates, Inc.

**J. J. Keller & Associates, Inc.** (2015). *Transportation Safety Answer Manual.* Neenah, WI: J. J. Keller & Associates, Inc.

**National Safety Council (NSC).** (2008). *Defensive Driving Course: Professional Truck Driver Participant Manual.* Itasca, IL: National Safety Council.

**National Transportation Safety Board (NTSB).** (2013). *Crashes Involving Single-Unit Trucks that Resulted in Injuries and Deaths.* Safety Study NTSB/SS-13/01. Washington, DC: U.S. Government Printing Office.

**North American Transportation Management Institute (NATMI).** (2019). *Motor Fleet Safety Supervision Principles and Practices.* Eighth Edition. Denver, CO: North American Transportation Management Institute.

©W. Cody Middlebrook



**North American Transportation Management Institute (NATMI).** (n.d.). *Fleet Accident Investigation Student Handbook.* North American Transportation Management Institute.

**North American Transportation Management Institute (NATMI).** (n.d.). *Root Cause Analysis of Critical Crashes: Process of Elimination Methodology.* Denver, CO: North American Transportation Management Institute.

**Office of the Secretary of Transportation.** (2023). *Code of Federal Regulations: Part 40 - Procedures for Transportation Workplace Drug and Alcohol Testing Programs*. 49 CFR Subtitle A, as amended. U.S. Department of Transportation.

**Peterman, D. R.** (2017). *Commercial Truck Safety: Overview.* Congressional Research Service Report R44792. Retrieved from https://crsreports.congress.gov.

**Pipeline and Hazardous Materials Safety Administration (PHMSA).** (2023). *Code of Federal Regulations: Title 49 - Transportation, Parts 100-199*. U.S. Department of Transportation.

**Pipeline and Hazardous Materials Safety Administration (PHMSA).** (2024). Emergency Response Guidebook (ERG2024): A Guidebook for First Responders During the Initial Phase of a Dangerous Goods/Hazardous Materials Transportation Incident. U.S. Department of Transportation, Transport Canada, and Mexico Secretariat of Communications and Transportation.

**Professional Truck Driver Institute (PTDI).** (2011). *Skill Standards for Entry-Level Commercial Motor Vehicle Drivers.* Revised May 20, 2011. Alexandria, VA: Professional Truck Driver Institute, Inc.

**Rasmussen SA, Goodman RA** (Eds.). (2019). *The CDC Field Epidemiology Manual*. Oxford University Press.

**Short, J., Boyle, L., Shackelford, S., Inderbitzen, B., & Bergoffen, G.** (2007). *The Role of Safety Culture in Preventing Commercial Motor Vehicle Crashes (CTBSSP Synthesis 14).*

©W. Cody Middlebrook



Transportation Research Board, Washington, D.C. Sponsored by the Federal Motor Carrier Safety Administration (FMCSA).

**Smith System Driver Improvement Institute.** (1987, revised 1992). *Driver's Guide to the Smith System: The Five Keys to Safe Driving.* Arlington, TX: Smith System Driver Improvement Institute, Inc.

**United States Department of Transportation, National Highway Traffic Safety Administration (NHTSA).** (2025). *Federal Motor Vehicle Safety Standards (FMVSS), 49 CFR Part 571.* Washington, DC: U.S. Department of Transportation.

**U.S. Congress.** (1935). *Motor Carrier Act of 1935.* Public Law 74-255. Codified at 49 U.S.C. §§ 301–327. U.S. Government Printing Office.

**U.S. Congress.** (1966). *Department of Transportation Act of 1966.* Public Law 89-670. Codified at 49 U.S.C. § 101. U.S. Government Printing Office.

**U.S. Congress.** (1970). *The Highway Safety Act of 1970.* Public Law 91-605. Codified at 23 U.S.C. § 401. U.S. Government Printing Office.

**U.S. Congress.** (1984). *49 U.S.C. § 31136: United States Government Regulations for Commercial Motor Vehicle Safety.* Public Law 98-554. Codified at 49 U.S.C. § 31136. U.S. Government Printing Office.

**U.S. Congress.** (1984). *Motor Carrier Safety Act of 1984.* Public Law 98-554. Codified at 49 U.S.C. §§ 2501–2518. U.S. Government Printing Office.

**U.S. Congress.** (1986). *Commercial Motor Vehicle Safety Act of 1986.* Public Law 99-570, 99th Congress.

**U.S. Congress.** (1999). *Motor Carrier Safety Improvement Act of 1999.* Public Law 106-159, 106th Congress.

©W. Cody Middlebrook

**U.S. Congress.** (2005). *Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU).* Public Law 109-59. Codified at 23 U.S.C. § 101 et seq. U.S. Government Printing Office.

**U.S. Congress.** (2012). *Moving Ahead for Progress in the 21st Century Act (MAP-21).* Public Law 112-141, 112th Congress.

**U.S. Congress.** (2015). *Fixing America's Surface Transportation Act (FAST Act).* Public Law 114-94, 114th Congress

©W. Cody Middlebrook