## 2020 CARTAGE AGREEMENT

This Cartage Agreement ("Agreement") between DHL Express (USA), Inc. ("DHL") and Independent Service Provider <u>Flyway Express LLC</u> ("ISP") is effective as of the Effective Date listed below.  Except as expressly set forth herein, all terms and conditions of the existing Cartage Agreement and related Schedules shall continue to be in full force and effect.

Date: <u>April 25, 2021</u>

Independent Service Provider Name: Flyway Express LLC
Address:        6340 Hurt Road
City, State, Zip Code: Horn Lake, MS  38637
Territory ID: 1008 (the "Territory")
Locations/Station Codes:        MEM (MEM, MKL, JAN, TUP), MSY (BTR, LFT, MOB, PNS), TXK
Entity Type:   Limited Liability Corporation
Federal Tax ID No.:   94-3421056
Fax:     662-796-0066
E-mail: skriese@flywayexpress.com

This Agreement is Acknowledged and Agreed to by:

DHL Express (USA), Inc.

By:_____
Kevin Little
— F6B2BD024BAA497...
Signature / Corporate Authorized

Kevin Little
Printed Name

Director of IE and IC Relations
Title
        Apr 20, 2021 | 04:17 PDT

Date

Independent Service Provider

By_____
Steve Kriese
— 6C409D2BE0894D1...
Signature

Steve Kriese
Printed Name

President
Title
        Apr 24, 2021 | 10:28 PDT

Date

DHL Express (USA), Inc.

By:_____
Juan Cucalon
— 7689C19C0E074C6...
Signature / Corporate Authorized

Juan Cucalon
Printed Name

Regional Service Director – Area 1
Title
        Apr 19, 2021 | 10:21 PDT

Date

**EXHIBIT A**

1.  Background.  DHL is an express transportation company, an air freight forwarder, and an agent for direct air carriers.  ISP is engaged in the business of performing local ground transportation, pick-up, and delivery services and represents to DHL that it is able to perform the Services (as defined below) in the Territory and Service Areas (as defined below) under such certificates, permits, and licenses as may be required by any governmental or municipal entity having authority over ISP and in compliance with all applicable laws, rules, regulations, and other governmental requirements.  DHL wishes to receive, and ISP wishes to provide as an independent ISP, the Services in the Territory and Service Areas, all in accordance with, and subject to, the terms and conditions of this Agreement.

2.  Definitions.  In addition to any terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below:

2.1  "ISP Vehicles" shall mean the motor vehicles (including trailers) used by ISP to perform the Services under this Agreement.

2.2  "ISP Workers" shall mean the employees of ISP who perform Services under this Agreement.

2.3  "DHL Marks" shall mean the trademarks, tradenames, services marks, and logos of DHL designated by DHL from time to time for ISP's use in connection with ISP's performance of the Services.

2.4  "Fees" shall mean the amounts payable by DHL to ISP as set forth in Schedule A for ISP's performance of the Services under this Agreement.

2.5  "Term" shall have the meaning set forth in Section 9.1.

2.6  "Safety Standards" shall mean (a) all standards of safety established by ISP with respect to the Services (which shall in no event be less than applicable industry standards), (b) all standards of safety required under any applicable laws, rules, regulations, and other governmental requirements, and (c) if any ISP Workers are on DHL premises, DHL's safety standards while such ISP Workers are on DHL premises.

2.7  "Security Standards" shall mean (a) all security policies established by ISP with respect to the Services (which shall in no event be less than applicable industry standards), (b) all DHL security standards that may be provided to ISP by DHL from time to time in writing, and (c) all applicable security standards of any jurisdiction(s) in which any of the Services are provided.

2.8  " Service Areas" shall mean the geographic areas specified in Schedule B in which ISP will perform the Services.

2.9  "Services" shall mean the cartage and related services specified in Schedule B, as well as any incidental services, functions, and responsibilities not specified in Schedule B but which are reasonable and necessary for the proper performance and provision of such cartage and related services.

2.10 "Territory" shall mean an IATA or group of IATA as identified in the bid document and specified in one or more Schedule B in which the ISP will perform services.

2.11 "Term" shall mean the Term and the Terms, if any.

2.12 "ISP" shall mean Independent Service Provider and shall replace all references to "ISP" in the Cartage Agreement.

2.13 "ISP Employees" shall mean those employees retained by ISP to perform the Services under this Agreement and shall replace all references to "ISP Workers" in the Cartage Agreement.

2.14 "BLS" shall mean United States Department of Labor – Bureau Labor Statistics.

2.15 "Global SOP" shall mean Global Standard Operating Procedures (or Platform) encompassing DHL Operations policies, processes, and procedures relating to the handling of all international products and the related supporting functions.

3. Cartage Services.

3.1 Provision of Services. Commencing on the Effective Date, ISP shall perform the Services in the Territory and Service Areas. The Territory and Service Areas may be increased or reduced upon written agreement of the parties. The Services shall at all times be performed in accordance with the terms, conditions, and requirements of this Agreement. ISP has made an independent evaluation of the Services to be provided, including anticipated volumes of such Services, and asserts that it is able to fully perform the Services in accordance with the requirements of this Agreement.

3.2 Independent ISP Status. In performing Services under the terms of this Agreement, the parties are acting, and shall act, as independent ISPs. Neither party is, nor will be deemed to be, an agent, legal representative, joint venture, franchisor, franchisee, or legal partner of the other party for any purpose. Neither party will be entitled to: (a) enter into any contracts, hire employees or make any representations or warranties in the name of or on behalf of the other party; (b) pledge the credit of the other party in any way or hold itself out as having authority to do so; or (c) make commitments or incur any indebtedness, costs, charges or expenses, or sign any agreement or other document for or in the name of the other party.

3.3 Manner of Performance. The manner and means by which ISP performs the Services shall be of ISP's sole discretion and control and are ISP's sole responsibility. Without limiting the foregoing, ISP shall have exclusive control of:

3.3.1 The wages, hours, and working conditions of the ISP Employees, specifically including but not limited to decisions about determining or modifying compensation and benefits to ISP Employees, scheduling ISP Employees on a daily or work week basis, including control over the hours worked on a daily and work week basis and compliance with applicable meal and rest period requirements.

DHL shall have no obligation to pay ISP Employees any wages, compensation, premiums, and/or associated penalties due to them by ISP;

3.3.2  Assigning and directing duties, responsibilities, tasks, projects, or assignments to ISP Employees on a daily or work week basis.  DHL shall have no right, directly or indirectly, to control how, what, when or where the ISP Employees provide services to ISP;

3.3.3  The selection and supervision of ISP Employees, including but not limited to recruiting, screening, the application process, interviewing, hiring, implementation of personnel and wage and hour policies, procedures, and practices, training, supervision, evaluation, promotion, demotion, discipline, separation, termination, and retention.  DHL shall have no rights to determine or provide input into the methods used by ISP to select, train, supervise, evaluate, discipline, and retain ISP Employees; and

3.3.4  The resources used by ISP to provide the Services on a daily or work week    basis, including but not limited to: the number of ISP Vehicles used; the number of ISP Employees; the number of routes to be included in a Territory or Service Area; and the tools and instrumentalities used by ISP to provide the Services.  ISP shall have the sole right to determine all aspects of its performance of its obligations under this Agreement, including the staffing, maintenance, operation, and routing of the ISP Vehicles in the Territory and/or Service Area.

3.4  ISP Employees.

3.4.1  Compliance.  ISP agrees that all persons performing Services pursuant to this Agreement shall be employees of ISP, in compliance with all applicable local, state and federal laws.

3.4.2  Status of ISP's Employees.  The Parties acknowledge and agree that the ISP Employees are not employees of DHL and are not entitled or otherwise eligible to participate in or receive any benefits or rights as employees of DHL, under any employee benefit and welfare plan, including, any employee insurance, pension, savings, or security plan, and shall have no rights to compensation from DHL.  The Parties further acknowledge and agree that the ISP Employees are not joint employees of DHL and ISP.  ISP acknowledges that any compensation due to any ISP Employees is its exclusive obligation, and that DHL shall have no obligation to compensate ISP's Employees under any condition or circumstance.  Without limiting the generality of any of the foregoing, ISP Employees shall not be considered employees of DHL, or joint employees of DHL and ISP, for purposes of any local, state or federal laws relating to unemployment insurance, social security, workers' compensation, or any regulations which may impute any obligation or liability to DHL by reason of an employment relationship, including federal, state, municipal, or local laws, ordinances, or regulations pertaining to wages and hours and/or the prohibition of harassment, discrimination, or retaliation in the workplace.  ISP shall be solely responsible for providing any salary or other compensation (which, if applicable, shall be provided in accordance with the Service Contract Act of 1965) or benefits to each ISP Employee (and for the timely and accurate payment thereof) and for any insurance and taxes, including health insurance, taxes, FICA,

and other governmental levies on monies in connection therewith.  ISP shall communicate to each ISP Employee that she or he is not an employee of DHL, and also that the ISP Employee is not a joint employee of DHL and ISP.  Before each ISP Employee begins performing any Services, ISP shall obtain a written acknowledgement from each ISP Employee detailing his or her agreement, acknowledgement and understanding that she or he is not an employee of DHL, and is also not a joint employee of ISP and DHL, and that DHL owes him or her no obligations (and shall have no liabilities) as his or her employer.  Such written acknowledgement shall be in the form attached hereto as Appendix 1.  ISP shall retain each acknowledgment and provide DHL with copies upon request.

3.4.3  Alcohol and Drug Screening.  To ensure compliance with all applicable laws, ordinances, and regulations, ISP shall, at its sole cost and expense, implement an alcohol and drug screening program for all ISP Employees.  Such screening program shall include random testing of ISP Employees such that ISP Employees are screened for drugs and alcohol in accordance with the random testing requirements of the Federal Motor Carrier Safety Administration (49 C.F.R 382.305).  The laboratory testing under such screening program shall be performed by a commercially competent and professional third party testing company selected by the ISP, and consistent with all applicable legal requirements.  All ISP Employees shall be required to: (a) pass such drug screening prior to beginning to performing services for ISP; and (b) submit to such alcohol and drug screening on a random basis for so long as such ISP Employee continues to provide services for ISP, consistent with the requirements of applicable law.  ISP acknowledges and agrees that additional obligations with respect to alcohol and drug testing may be imposed upon ISP under applicable laws, rules, regulations, and other governmental requirements. ISP accepts full responsibility for complying with all such laws and upon request, shall provide DHL with written certification that ISP is in compliance with its obligations under this Section.

3.4.4  Background Screening.  To ensure compliance with all applicable laws, ordinances, and regulations, ISP shall, at its sole cost and expense, conduct, or cause to be conducted, an extensive background screening of each ISP Employee.  Such background screening shall include: (a) a comprehensive criminal background check conducted at the federal and county level, including a National Criminal database search, for each jurisdiction in which such ISP Employee has resided in the 5-year period referenced in the following sentence, (b) a Social Security number trace, (c) a Department of Transportation employment verification, and (d) a motor vehicle records check.  Each such background screening shall include all applicable records for the 5-year period prior to the date of such ISP Employee's application to become an ISP Employee.  The background screening shall be performed by a commercially competent and professional third party background screening company selected by the Service Provider, and consistent with all applicable legal requirements.  ISP shall update the motor vehicle records check required under subsection (b) in the preceding sentence at least once per year during the Term.  To the fullest extent permitted by law, and in accordance with the EEOC Criminal History Guidance, ISP shall not authorize or permit any ISP Employee to perform any Services who (i) has been convicted of or has pled guilty to a felony or

misdemeanor involving theft, violence, dishonesty, sexual abuse or assault, the distribution or intent to sell any illegal drug or regulated substance, or the use or possession of weapons, (ii) has a revoked or suspended motor vehicle license, or who has motor vehicle records that are inconsistent with ISP's safe driving requirements, or (iii) ISP reasonably believes could pose a safety or security risk to DHL or its customers.  ISP at its discretion may perform an individualized assessment on an ISP Employee to confirm that a given record falls under the categories enumerated above before making such a determination.  The provisions of this Section shall not apply to the extent made unlawful by applicable laws, rules, regulations, and other governmental requirements.  ISP certifies to DHL the information it receives in connection with background screening will not be used in violation of any applicable federal, state or local laws, including, but not limited to the Fair Credit Reporting Act, the Driver Privacy Protection Act and Title VII of the Civil Rights Act of 1964, ISP acknowledges and agrees that additional obligations with respect to background screening may be imposed upon ISP under applicable federal, state or local laws, rules, regulations, and other governmental requirements.  ISP accepts full responsibility for complying with all such laws, using the information it receives in connection with background screening in a legally acceptable fashion, and providing all statutorily required notices in connection therewith.  Upon request of DHL, ISP shall provide DHL with written certification that ISP is in compliance with its obligations under this Section.

3.4.4.1  Badge and Background Security Accuracy.  ISP agrees to maintain an accurate list of ISP employees working at DHL facilities.  ISP will update all records for compliance with STA, SIDA, or badging requirements including collection of expired or terminated badges and returning immediately the badges to authorized issuing party for disposal.  Loss badge and any fees and penalties will be the responsibility of the ISP with the issuing authority.  Failure to return badges that have expired or terminated for disposal will result in an assessed security penalty of $25.00 per badge.

3.4.4.2  Denied Parties Screening.  ISP will screen all prospective ISP Employees against restricted/denied party lists as compiled by the Department of Treasury Office of Foreign Assets Control (OFAC) Special Designated Nationals (SDN) and the U.S. Department of Commerce (DOC)'s denied parties.  ISP agrees not to have any persons found to be denied or restricted parties under such government designations perform any Services under this Agreement. Upon request of DHL, ISP shall provide DHL with written certification that ISP is in compliance with its obligations under this Section.

3.4.5  Orientation and Training of ISP Employees to DHL's Business.  ISP shall, at ISP's sole cost and expense, provide the ISP Employees with such information and training as may be necessary for the ISP Employees to perform the Services in accordance with this Agreement.  Such training shall include but not be limited to all training mandated by OSHA, DOT, TSA or any other federal, state, or local law or regulation.  Upon request of DHL, ISP shall provide DHL in writing with certifications that each ISP Employee has received all government mandated training.

3.4.6  SECTION DELETED

3.4.7  <u>Trademark Usage Guidelines</u>.  ISP shall require each ISP Employee to fully comply with relevant portions of the Trademark Usage Guidelines (Schedule "C").

3.5  <u>Vehicles Used by ISP.</u>

3.5.1  <u>ISP Vehicles</u>.  ISP, at its sole cost and expense, shall obtain, furnish, operate, and maintain such ISP Vehicles as may be necessary for ISP to perform the Services in accordance with the provisions of this Agreement.  DHL shall have no authority or control over the financing, purchase, maintenance or operation of ISP Vehicles.

3.5.2  <u>Responsibility for ISP Vehicles</u>.  With respect to each ISP Vehicle, ISP shall be solely responsible for (a) procuring necessary titling, licensing, permits, and registration, (b) furnishing all fuel, lubricants, and other supplies and consumables, (c) obtaining appropriate insurance coverage (including the insurance coverage required under this Agreement), and (d) bearing all other costs and expenses relating to the ISP Vehicles (including any fines, penalties, or fees relating to moving or traffic violations).  ISP acknowledges that it is solely responsible for ISP Vehicles and DHL will not pay for any ISP Vehicle when this Agreement terminates.

3.5.3  <u>Type and Appearance of ISP Vehicles</u>.  ISP shall, at its sole cost and expense, ensure that each ISP Vehicle fully conforms to: (a) the vehicle type requirements set forth in the Trademark Usage Guidelines; and (b) the appearance standards set forth in Trademark Usage Guidelines.  DHL will, upon submission of appropriate invoice to DHL, pay the direct material cost (not inclusive vehicle preparation costs) for the first, initial, or original set of decals for a new, qualified ISP Vehicle that previously had not been entered into service or branded with DHL decal requirements as set forth in the Trademark and Usage Guidelines.

3.5.4  <u>ISP Vehicle Inventory</u>.  ISP recognizes and agrees upon the importance of DHL to actively manage and track Trademark Usage by each ISP, to include inventory tracking of branding and de-branding of vehicles. DHL will assign a DX identification number to each branded vehicle and ISP will display number as outlined in Schedule-C, Section 4.3.  ISP further agrees to provide DHL with the VIN, Vehicle Type, Vehicle Make / Model, and Vehicle Year for any ISP Vehicle in operation performing Services and displaying DHL Marks and promptly notify DHL of any changes.

3.5.5  <u>Retirement of ISP Vehicles</u>.  If ISP retires or otherwise ceases to use any ISP Vehicle bearing a DHL Mark in providing Services under this Agreement, ISP shall immediately remove all DHL Marks from such ISP Vehicle by complete removal of all DHL decals (including repainting if required or other such means to hide decals remaining shadow footprint from recognition on such ISP Vehicle).  Upon proof and validation in meeting minimum de-branding criteria outlined in this Agreement, DHL shall pay the reimbursement cost of such de-branding up to DHL's then-standard amount for such de-branding.  If ISP or ISP's Vehicle does

not meet minimum de-branding criteria outlined in this Agreement, de-branding costs shall be the responsibility and at the sole expense of the ISP (and does not relieve or preclude ISP from fulfilling de-branding contractual responsibilities with DHL Marks).

3.5.6  ISP's Early Retirement of Vehicles. A vehicle will be classified as Early Retirement when an ISP opts, at ISP's sole discretion, to retire a vehicle before five years of service or before attainment of 200,000 miles.  In the event that a Replacement Vehicle is put into service by ISP as a result of an Early Vehicle Retirement, the material cost and installation costs for an original set of decals to be installed on the Replacement Vehicle shall be at the sole cost and responsibility of the ISP.

3.5.7  Maximum Age of Vehicle with DHL Marks. Beginning January 31, 2021, ISP shall not operate a vehicle greater than 8 years of age determined by the year of manufacture with DHL Marks on vehicle types outlined in Schedule-C, Section 4.8 small cargo van, medium cargo vans; large cargo vans; or cube box trucks.  ISP shall not operate a vehicle greater than 15 years of age determined by the year of manufacture with DHL Marks on vehicle types outlined in the Schedule-C, Section 4.8 as box straight trucks; or tractor & trailers.

3.6  Compliance with Applicable Safety and Security Standards.  ISP shall, at ISP's sole cost and expense, ensure that all ISP Employees, ISP Vehicles, and facilities used by ISP to perform the Services comply with all applicable industry Safety and Security Standards.  ISP shall immediately report to DHL any unsafe working conditions, practices, or equipment at DHL's facilities.  ISP shall immediately report to DHL, in a format acceptable to DHL, all safety or security accidents and incidents that involve any non-minor injuries or property damage or theft likely to exceed a value of $10,000 while performing work under this Agreement.  In addition to applicable industry Safety and Security Standards, ISP will establish their own safety and security programs and will share these with DHL upon request.

3.7  Information Regarding Shipments.  ISP shall (a) provide to DHL timely, true, and accurate information regarding the status of shipments and (b) comply with the scanning specifications set forth in Schedule B.  Any falsification or deception in ISP's provision of information regarding the status of shipments shall be deemed a material breach of this Agreement.

3.8  Receipts for Shipments.  ISP shall require and obtain receipts in written or electronic form for all shipments which ISP may deliver to or pick up from either DHL or any other consignee/receiver pursuant to the provisions of this Agreement. If there is a shortage in, or damage to, any shipment, ISP shall note such fact on the receipt.  ISP shall deliver such receipts to DHL as set forth in Schedule B.

3.9  Loss and Damage to Shipments.  ISP shall exercise industry standards of reasonable care, and ensure that all appropriate steps are taken in the handling of shipments to avoid loss or damage thereto.  ISP acknowledges and agrees that the loss of, or damage to, any shipments handled by ISP under this Agreement may, among other possible outcomes, have a negative effect on DHL's reputation and

may result in lost business for DHL.  ISP further acknowledges and agrees that the damages resulting from any such loss or damage are difficult to quantify.  Accordingly, ISP shall be liable to DHL, as liquidated damages and not as a penalty, for any and all loss of, or damage to, shipments transported by ISP for DHL or its customers under this Agreement while such shipments were in ISP's possession or control in an amount in each instance equal to the declared value of such shipment or the actual value of the shipment, whichever is greater.

3.10  Provision of Certain Items by DHL.  DHL shall from time to time provide to ISP certain items as ISP may reasonably require to perform the Services in accordance with the requirements of this Agreement.  ISP shall be liable to DHL for the replacement cost of any such items that may be lost, stolen, or damaged while in ISP's possession or control.  ISP shall not permit the use of any such items other than in connection with ISP's performance of the Services.

3.11  DHL's Dispatch Application and Technology.  The use of DHL's dispatch application and technology is designed to facilitate ISP's operations in making pickups and deliveries and is not intended to (and ISP agrees that it will not be deemed to) direct, control, or influence the manner and means by which ISP conducts its business, specifically including the direction, control or supervision of ISP's Employees.  Consistent with this Agreement, the manner and means by which ISP performs the Services shall be at ISP's sole discretion and control and are ISP's sole responsibility.

3.11.1  Dispatch Contingency Procedures.  ISP recognizes and acknowledges that from time to time technology systems, such as DHL's dispatch application, may incur technical problems inhibiting or preventing booking information from electronically being sent to or received from scanner devices in a timely manner. As such, ISP must ensure, at ISP's sole cost, control and manner and means of performance, that timely and appropriate communication contingency programs and related communication devices or communication protocols be enacted and executed immediately by ISP to prevent or minimize potential service failures resulting from a dispatch application or technology failure.

3.12  Non-Exclusive Arrangement.  Nothing in this Agreement shall prevent ISP from performing any cartage or related services for any other person or entity, nor prevent DHL from engaging any other person or entity to provide cartage or related services (whether in the Territory and Service Areas or otherwise); provided, however, that in no event shall ISP (a) provide cartage or related services to DHL's direct competitors in regional or nationwide express transportation without DHL's prior written authorization or (b) provide such cartage or related services to a third party in a manner that in any way violates the Trademark Usage Guidelines (including, for example, by having ISP Workers perform such cartage or related services while wearing a uniform with a DHL Mark or using a ISP Vehicle with a DHL Mark). ISP acknowledges and agrees that DHL has not agreed to provide ISP with any particular quantity of work hereunder and has not guaranteed to ISP any minimum level of revenue for performing the Services.

3.13  After-Hours Facility Access.  ISP acknowledges that it shall have no rights to enter DHL facilities "After-Hours" and that it should have no legitimate business reason to enter DHL facilities "After-Hours."  For purposes of this Agreement the term "After-Hours" is defined as those hours not within posted business hours or not within the usual and customary operational hours of each DHL facility.  ISP may request After-Hours facility access in writing, which may be granted by DHL in its absolute discretion on a case by case basis.  ISP assumes all liability associated with such After-Hours facility access, and accepts safety, security, and related liabilities and responsibilities for, including but not limited to, safety of ISP Employees, safety and security requirements for the facility, equipment, and for customer shipments.

3.14  SECTION DELETED.

3.15  SECTION DELETED.

3.16  SECTION DELETED.

4.  Compliance with Law.

4.1  General Obligation to Comply with Applicable Law.  ISP shall, at its sole cost and expense, comply with all applicable laws, rules, regulations, and other governmental requirements (as each of the foregoing may be amended or modified from time to time) relating to or affecting this Agreement, the Services to be performed by ISP hereunder, the ISP Workers, the ISP Vehicles, or the facilities and other assets used by ISP in performing the Services, and ISP shall obtain and maintain all permits, licenses, and consents required in connection therewith.  ISP acknowledges and agrees that ISP is required to maintain records regarding its compliance with this Section 4 and that DHL shall have access to all such records, in each case as set forth in further detail in Section 8.

4.2  Compliance with Specific Laws.  Without limiting the generality of Section 4.1, ISP shall, at its sole cost and expense, comply with the following laws, rules, regulations, and other governmental requirements:

4.2.1 the Fair Credit Reporting Act (15 U.S.C. sec. 1681 et seq.), and all regulations promulgated thereunder;

4.2.2  with respect to any ISP Worker who drives a commercial motor vehicle (as defined in 49 C.F.R. 390.5) as part of providing the Services  all applicable provisions of the Federal Motor Carrier Safety Regulations (49 C.F.R. 325 et seq.), including: (a) Part 383, "Commercial Driver License Standards; Requirements and Penalties" (49 C.F.R. 383), (b) Part 391, "Qualifications of Drivers" (49 C.F.R. 391), and (c) Part 382, "Controlled Substances and Alcohol Use and Testing" (49 C.F.R 382);

4.2.3  all applicable laws, rules, regulations, and other requirements of the department(s) of transportation for the state(s) in which ISP provides Services;

4.2.4  all workplace safety regulations as per 29 CFR, Occupational Safety and Health Administration.

4.2.5  all applicable traffic and speed laws;

4.2.6  all applicable laws, rules, regulations, and other governmental requirements concerning the handling and transportation of hazardous materials, including all training required by 49 C.F.R. sec. 172.702-172.704 and 177.800-177.870;

4.2.7  Executive Order 11246, "Equal Employment Opportunity" (Exec. Order No. 11246, 30 Fed. Reg. 12319), and all other applicable laws, rules, regulations, and other governmental requirements relating to equal opportunity, affirmative action, and fair treatment of employees;

4.2.8  the Federal Drug-Free Work Place Act (41 U.S.C. 701 et seq.), and all regulations promulgated thereunder;

4.2.9  the Service Contract Act of 1965 (41 U.S.C. 351 et seq.), and all regulations promulgated thereunder; and

4.2.10  the Aviation and Transportation Security Act of 2001, and all regulations promulgated thereunder.

4.2.11  all applicable Federal, State, County, and City environmental laws, regulations and ordinances pertaining to proper control, storage, handling, containment, and disposal of any waste or products  identified thereunder;

4.2.12  the Immigration Reform and Control Act of 1986; and

4.2.13  the Fair Labor Standards Act, Americans with Disabilities Act, Title VII of the of the Civil Rights Act, Age Discrimination in Employment Act, Family Medical Leave Act and any and all other employment related Federal, state and local laws, statutes, ordinances and regulations.

4.3  Certification of Compliance.  Upon request by DHL, within seventy-two (72) hours, ISP shall provide the following certifications and information in writing to DHL:

4.3.1 certification that all ISP Workers have received training in hazardous materials handling as required under Section 4.2.2

4.3.2 certification that such number of ISP Employees as necessary to meet the need for shipment of hazardous materials in the ISP's Territory and/or Service Area, but in any event not less than one ISP Employee, have obtained a Hazardous Material Endorsement ("HME") pursuant to 49 C.F.R. 1572 on such ISP Employee's commercial driver's licenses; ISP is responsible for the handling of hazardous materials shipments and agrees to establish contingencies to successfully pickup or deliver shipments within the established service standards  as set forth in the Schedule-B and in compliance with all applicable laws.

4.3.3 Provide annual certification under Appendix 2 on compliance with this Cartage Agreement and with all applicable laws and regulations on an annual basis but no later than the 15th of January.  Nothing in this Section shall limit DHL's audit rights.

4.3.4  a true and accurate Transportation Security Administration Security Statement, to be provided on an annual basis no later than the 15th day of January of each year; and

4.3.5  a true and accurate Transportation Security Administration Training Roster, to be provided on an annual basis no later than the 15th day of January of each year.

4.3.6 All of the ISP's employees providing services under this agreement must have an approved Security Threat Assessment (STA) validation number. The ISP must keep the original STA application on file for a minimum of 180 days after the termination of services of any employee and be able to present the application upon request from either DHL or a TSA agent.

5.  Economic Terms.

5.1  Fees.  In consideration of ISP's performance of the Services, DHL shall pay to ISP the Fees.  ISP acknowledges and agrees that calculation of the Fees for any particular week is based on information entered into the scanners used by ISP Workers, which information is then sent to and received by DHL's computer systems.  Automated payments will be generated on a weekly basis as processed through the DHL Cartage Payables system.  Payments for manually billed items will be included with the weekly payments as received and processed by DHL but in all events within 30 days after DHL receives confirmation that such information is true, accurate, and complete.  If and to the extent DHL from time to time permits ISP to submit information regarding the Services it performed in a particular week on a manual basis, ISP shall submit such information by Tuesday of the week following the week in which such Services were performed and any such submission shall include a statement that the information so provided is true, accurate, and complete.

5.2  Additional Payment Related Terms.  DHL shall not be required to pay any invoices or requests for payments (a) not submitted in accordance with this Section 5 or (b) for Services for which ISP has not submitted full information to DHL within 30 days after the performance by ISP of such Services.  If either party becomes aware of an overcharge or undercharge with respect to the Fees, such party shall promptly notify the other party thereof.  ISP shall not be entitled to receive any portion of any of DHL's charges to its customers.  DHL shall have the right to set off any amounts ISP (or any parent, affiliate, or subsidiary of ISP) owes to DHL against any amounts DHL owes ISP; provided, however, that prior to applying any such set-off, DHL shall (a) provide ISP with notice of its intent to exercise its right to set off amounts under this Section 5.2, which notice shall include an explanation of the reason for the set-off, and (b) provide ISP with a reasonable period of time to review and respond to such notice.  Subject to Section 8.4, if ISP fails to dispute any amounts paid by DHL to ISP under this Agreement within 30 days after DHL's payment thereof, such payment shall be deemed to be accepted and accurate by ISP. The parties shall use commercially reasonable efforts to resolve any disputed payments within 45 days after issue is discovered.

5.3 <u>Taxes</u>.  The Fees paid to ISP hereunder are inclusive of any applicable sales, use, gross receipts, excise, value-added, withholding, personal property, or other similar taxes attributable to periods on or after the Effective Date ("Taxes").  If any Taxes are assessed on the provision of the Services by ISP to DHL or on ISP's charges to DHL under this Agreement, however levied or assessed, ISP shall bear and be responsible for and pay the amount of any such Taxes, and, if applicable, shall reimburse DHL for the amount of any such Taxes paid by DHL.  Except as otherwise expressly provided herein, each party shall pay all taxes and legal, accounting, and other expenses incurred by such party in connection with the negotiation, execution, and performance of this Agreement.

5.4 <u>Adjustment of Fees</u>.

5.4.1 <u>Request for Fee Negotiations</u>.  Each party acknowledges that it may from time to time be appropriate to adjust the Fees due to changing market conditions or other circumstances.  Accordingly, either party may from time to time request that the parties discuss an adjustment to the Fees.  Any such request shall be made in writing in accordance with the provisions of Section 15.8 on a standard form provided by DHL, which form lists appropriate supporting documentation to be attached to such form, and shall specifically reference this Section 5.4.1 (the "Fee Negotiation Request").

5.4.2 <u>Fee Negotiations.</u>  Promptly following receipt by a party of a Fee Negotiation Request, the parties shall commence good faith negotiations of an appropriate adjustment to the Fees (the "Fee Negotiations"), which negotiations may extend for up to 45 days following the receipt of the Fee Negotiation Request (the "Fee Negotiation Period").

5.4.3 <u>Agreement to Fee Adjustment</u>. If at any point during the Fee Negotiation Period the parties agree to adjust the Fees, the parties shall execute an appropriate amendment to this Agreement.  The adjusted Fees shall be effective as of the date specified in such amendment.

5.4.4 <u>Failure to Agree to Fee Adjustment</u>; Termination.  If by the end of the Fee Negotiation Period the parties, despite their good faith efforts, are unable to agree to adjust the Fees, either party may terminate this Agreement in whole by providing the other party written notice thereof within five days after the end of the Fee Negotiation Period.  If either party issues a termination notice under this Section 5.4.4, this Agreement shall terminate 60 days after the date of such termination notice.

5.4.5 <u>Conditions and Restrictions.</u>  Notwithstanding the provisions of Sections 5.4.1 through 5.4.4, DHL shall not be required to commence any Fee Negotiations unless and until ISP is in full compliance with the terms and conditions of this Agreement.

6. <u>Confidentiality</u>.

6.1  Each party shall hold in confidence any non-public information about the other party, the other party's business (including the terms and conditions of this Agreement), the other party's business prospects (including lists of current or

potential customers), and any other non-public information provided to a party by the other party (collectively, the "Confidential Information").  In addition, the following shall be deemed "Confidential Information" of DHL: (a) any information regarding ISP's performance against the CPMs, and (b) any software or services of DHL that ISP may access in connection with this Agreement (including any IDs or passwords issued by DHL to ISP).  Neither party shall (i) use the Confidential Information other than in the performance of their respective obligations under this Agreement, nor (ii) disclose the Confidential Information of the other party to any third party.  The term "Confidential Information" does not include (1) information which at the time of disclosure is in the public domain, (2) information which enters the public domain, by publication or otherwise, other than by a wrongful act of the disclosing party, (3) information that was communicated to a either party by a third party free of any obligation of confidence, which third party was free to make such disclosure without breach of any legal obligation, or (4) any information that either party may disclose to a law enforcement agency in connection with the investigation of criminal activity.  Each party shall promptly notify the other party upon the discovering or learning of unauthorized possession, use, or disclosure of the other party's Confidential Information.

7.  <u>Use of DHL Marks</u>.

7.1  <u>License</u>.  Subject to the terms and conditions of this Agreement, DHL hereby grants to ISP a non-exclusive, non-transferable right and license to (a) identify itself as an independent ISP of DHL in Territory and Service Areas and (b) use (subject to Section 7.2) the DHL Marks  (i) on the ISP Vehicles, (ii) on the badges and uniforms used by the ISP Workers, (iii) on ISP's business cards, and (iv) in connection with the use by ISP of such advertising materials and sales aids as may be furnished to ISP by DHL hereunder, in each case solely in connection with ISP's performance of the Services hereunder.  ISP shall, at its sole cost and expense, comply with the requirements of the Trademark Usage Guidelines.  Upon DHL's request therefore, ISP shall submit to DHL a representation of its use of the DHL Marks.

7.2  <u>Disclosure to Public</u>.  With respect to each use by ISP of the DHL Marks, ISP shall conspicuously disclose that it is an independent ISP for DHL.  ISP shall under no circumstances portray itself as an employee, division, subsidiary, legal partner, agent, joint employer, or joint venture of or with DHL, as or being in any relationship other than that of independent ISP.

7.3  <u>Advertising Services</u>.  ISP's use of the DHL Marks shall constitute an advertising service, the compensation for which is included in the Fees.

7.4  <u>Reservation; Good Will</u>.  ISP acknowledges and agrees that DHL owns all right, title, and interest in and to the DHL Marks and all goodwill associated therewith.  All goodwill generated by ISP's use of the DHL Marks shall inure to the benefit of DHL.

7.5  No authorized use of the DHL Marks with ISP Company branding.  ISP will not print, use, or display DHL Marks in connection with their company branding

including ISP company letterhead, business cards, or other ISP related materials except as outlined in Section 7 and written authorization and approval from DHL.

7.6  No usage of DHL name with Service Provider Incorporated Company Name.  ISP will not create, change, or use a company name which includes the name DHL, DHL Express, or any variation thereof as part of their company name, incorporated, d/b/a or otherwise.

8.  Audit.

8.1  Record Retention.  ISP shall retain (during the Term and for three years thereafter, unless a longer period is required by applicable laws, rules, regulations, or other governmental requirements) records and supporting documentation sufficient to document ISP's compliance with the requirements of this Agreement and to support the Fees paid or payable by DHL under this Agreement.

8.2  Audits by ISP.  Upon written request from ISP during the Term, DHL shall provide ISP with such information as ISP may reasonably require to enable ISP to validate DHL's calculation of the Fees.  In no event, however, shall DHL be required to provide ISP with access to, or information regarding, DHL's internal computer systems, software, or methodologies.

8.3  Audits by DHL.  During the Term and for three years thereafter (unless a longer period is required by applicable laws, rules, regulations, or other governmental requirements), ISP shall provide DHL with such access, assistance, and documentation (including copies for DHL to possess) as DHL may reasonably require to enable DHL to: (a) verify ISP's conformance with the provisions of this Agreement, including but not limited to ISP's compliance with all laws and regulations; (b) verify ISP's compliance with Schedule-J, including a review of applicable wage statements and benefit plans; and (c) validate the Fees charged to DHL hereunder.  DHL shall provide ISP with reasonable notice of any audits or inspections that it wishes to perform under this Section 8.3; provided, however, that DHL shall have the right from time to time to perform "snap" or "unannounced" inspections under Subsection 8.3(a) above, for which no notice need be given. DHL hereby gives ISP notice that DHL may conduct audits on a quarterly basis. ISP shall provide DHL with such space (on ISP's premises) and access to such equipment (e.g., a copy machine) as DHL may reasonably require to perform the audits and inspections described in Section 8.0.  DHL may, in its sole discretion, engage third parties to perform auditing functions on its behalf.  Such third parties will be subject to the Confidentiality provisions described in Section 8.5.  An audit performed by DHL or a third party on DHL's behalf should not unreasonably interfere in the business of the ISP.

8.3.1  ISP Credit Check.  ISP agrees that DHL is authorized to perform credit check audits on an annual basis.

8.3.2  ISP Carbon Emissions.  On an annual basis, but by no later than January 15th of each year for prior year, ISP is required to provide DHL with formal certification of ISP's Carbon Emissions, as measured, reported, or calculated

per EPA SmartWay Program standards, or equivalent, thereof, for ISP Vehicles used in providing the Services.

8.3.2.1 ISP agrees that DHL may collect information via applications for the purposes of compiling DHL's total global emission footprint. Data collection time period will be at the discretion of DHL

8.3.2.2 ISP further agrees that DHL is authorized to use such information, collectively and in summary, to respond to governmental, regulatory, or customer inquiries or requirements pertaining to carbon emissions compliance or to represent DHL's corporate citizenship, vendor affiliations, and related to "GoGreen" programs.

8.4 Overcharges and Undercharges. If, as a result of an audit conducted under Sections 8.2 or 8.3, either party reasonably determines that ISP has overcharged DHL for the Services, or DHL has underpaid ISP for the Services, such party shall notify the other of the amount of such overcharge or undercharge. In the event of an overcharge, ISP shall promptly pay to DHL the amount of the overcharge. In the event of an undercharge, DHL shall promptly pay to ISP the amount of the undercharge.

8.5 Confidentiality of Audit. The parties agree to hold confidential, consistent with the provisions of Section 6, all information learned in the course of any audit or inspection under this Section 8, except when it is necessary for either party to reveal such information in order to enforce its rights under this Agreement in arbitration or in court and except when compelled by law.

9. Term and Termination.

9.1 Term. This Agreement shall commence on the 04/25/2021 and end on 08/10/2024 (the "Term"). Thereafter, this Agreement shall remain in effect for not longer than 60 days in order to allow the parties to negotiate a successor agreement, or to wind down the parties relationship under this Agreement, unless either party provides to the other party written notice that it does not wish to enter into a new Agreement at least 60 days prior to the end of the Term. In that event the Agreement shall terminate at the end of the term. Section 9.1 is not subject to additional payments.

9.2 Termination for Cause. This Agreement may be terminated immediately for cause by written notice at any time during the Term (subject to any applicable cure period specified below) as follows:

9.2.1 By either party, if a court of competent jurisdiction or governmental authority, regulatory or administrative agency or commission shall have enacted any law, statute, rule, or regulation or issued any final and non-appealable order or decree that restrains, enjoins, or otherwise prohibits either party from substantially performing under this Agreement;

9.2.2 By either party in whole (or in part with respect to a portion of the Territory and Service Areas, provided that the Services in the terminated portion of the Services Areas are the cause of the termination under this Section 9.2.2) if the other party has breached or failed to comply with any material term, condition, or covenant required to be performed or complied with by such other party, and such

16 of 31

breach or failure is not cured within 15 days (or, in the case of a breach or failure by ISP, such longer period of time as DHL may designate in its sole discretion) after written notice thereof by the terminating party;

9.2.3  By either party in whole or in part if the other party has breached or failed to comply with any term, condition, or covenant required to be performed or complied with by such other party (whether material or immaterial) more than three times in any 90-day period, regardless of whether such other party has cured any such breaches or failures, provided that the terminating party shall provide the other party with at least 15 days' prior written notice of such termination;

9.2.4  By either party, if the other party fails to comply with the requirements of Section 6 ("Confidentiality");

9.2.5  By DHL, if ISP suspends, abandons or terminates its operations in whole or in material part;

9.2.6  By DHL, if ISP fails to comply with the requirements of Section 4 ("Compliance with Law") or Section 10 ("Insurance"); or

9.2.7  By DHL, if ISP becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, becomes subject to any proceeding under bankruptcy or insolvency whether domestic or foreign, or has been liquidated voluntarily or otherwise.

9.2.8  By DHL,  pursuant to Section 15.7 – Assignment, any change of control of ISP Company or ISP Ownership which results in contracted company and principal ownership resulting in less than majority ownership and control.

9.3   Termination Without Cause   This Agreement may be terminated by DHL without cause at any point during the Term on at least 60 days prior notice.  If this Agreement is terminated by DHL under this paragraph:

9.3.1  Additional Payments:  If ISP performs the Services required under the Cartage Agreement until the termination date in material conformity with its terms, and materially performs the terms of this Cartage Agreement, DHL shall do the following:

9.3.1.1 Transition Payment:  DHL shall pay to ISP an amount equal to 8.5% of the average total revenue, to include fixed cost revenue such as Dock Services or Aircraft Handling, paid to the ISP for the last 6 weeks preceding the notice of termination multiplied by 13 weeks. For purposes of the Transition Payment, estimated payout shall be determined by multiplying the amount identified as the 6 week average revenue times 8.5% (0.085) times 13 weeks. The amount of the total Transition Payment is shown in Appendix 3.

9.3.1.2 ISP Vehicles:  No additional dollars will be paid for any ISP vehicles and no payments made for the Transition Payment shall be construed as a claim against any ISP vehicles.

9.3.1.3   Debranding: ISP shall commence de-branding all ISP Vehicles in accordance with the terms of Paragraph 3.5.4 of the Cartage Agreement within 7 days of the vehicle being retired from service.  Retired from service for the purpose

of this document shall be identified as a time when the vehicle is no longer being used to service DHL packages.  Proof that the vehicle was debranded shall be obtained by a visual inspection from the local DHL representative.  Once the vehicle has been inspected a de-branding confirmation document will be signed by both DHL and the ISP's representative.

9.3.2 Timing of Payments   If the ISP performs the Services required under the Cartage Agreement  through the termination date in material conformity with its terms,  the Payments described in Sections 9.3.1.1 and 9.3.1.4  shall be made as follows:

9.3.2.1  Transition Payment:  DHL shall pay ten percent (10%) of the Transition Payment within thirty days after the date that Appendix 3 is signed and executed.  DHL shall pay the remaining ninety percent (90%) within thirty days after the termination date. Payment of the Termination Agreement is dependent upon DHL receiving the following documents:

- Proof of de-branding document signed by both DHL and an ISP representative

- Return of all ISP employee ID badges

9.4  Effect of Notice of Termination.  During the period between the date of any notice of termination and the effective date of termination, ISP shall continue to perform the Services in accordance with the requirements of this Agreement.

9.5  Upon Termination.

9.5.1  Immediate Release of Shipments.  On or before the effective date of any termination or expiration this Agreement, or earlier if requested by DHL at any time, ISP shall immediately deliver to DHL (or make available for pick up by DHL) all packages, parcels, letters, or other shipments of DHL or its customers then in ISP's possession or control.  ISP acknowledges and agrees that if ISP fails to comply with the requirements of this Section 9.5.1, DHL shall be entitled to seek equitable relief under Section 14.4.

9.5.2  Return of Certain Items.  On or before the effective date of any termination or expiration of this Agreement, or earlier if requested by ISP at any time, DHL shall deliver to ISP (and will not keep in DHL's possession or deliver to anyone else) all Confidential Information of ISP (including any copies or summaries thereof) then in DHL's possession or control.  On or before the effective date of any termination or expiration of this Agreement, or earlier if requested by DHL at any time, ISP shall deliver to DHL (and will not keep in ISP's possession or deliver to anyone else) (a) all Confidential Information of DHL (including any copies or summaries thereof) then in ISP's possession or control, (b) all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment inventories, other documents or property, or reproductions of any aforementioned items, developed by ISP as part of or in connection with the Services or otherwise belonging to DHL, and (c) all items provided by DHL to ISP in connection with this Agreement (including any uniforms, badges, signage, forms and other documentation, and other items provided by DHL to ISP in connection with this Agreement).

9.5.3  Cease Use of DHL Marks.  On the effective date of any termination or expiration of this Agreement (or on such earlier date as DHL may specify), the license and right granted to ISP under Section 7 shall be, and is hereby, immediately terminated, and ISP agrees to discontinue immediately all use of DHL Marks, to remove the same from all the ISP Vehicles (including repainting if required or other such means to hide decals remaining shadow footprint from recognition on such ISP Vehicle) as well as any signs and other displays of ISP.  If ISP uses a debranding vendor approved by DHL for the debranding of ISP Vehicles under this Section 9.5.3, DHL shall pay the cost of such debranding up to DHL's then-standard amount for such debranding as set forth in Section 3.5.4.

9.6  Survival.  The provisions of Sections 3, 4, 6, 7.4, 8, 9.5, 9.6, 10,11, 12, 13, 14, 15, as well as any other provisions necessary to interpret the respective rights and obligations of the parties hereunder, shall survive the expiration or earlier termination of this Agreement.

10.  Insurance.

10.1  Required Coverage. ISP shall, at its sole cost and expense, maintain in effect continual insurance coverage during the Term as set forth below.  All such insurance coverage shall be (a) obtained in amounts no less than those specified below and, and (b) shall be primary and non-contributory to any other insurance maintained by, on behalf of, or benefiting DHL or any of its parents or subsidiaries.

10.2  Third Party Liability: Commercial General Liability insurance, written on an occurrence form, with minimum policy limits not less than $1,000,000 per occurrence and $2,000,000 annual aggregate, which may be met by any combination of Primary and Excess/Umbrella coverage; such policy shall include: (a) Premises/Operations Liability (which shall include coverage for all operations), (b) Products/Completed Operations Liability, (c) Contractual Liability and (d) a Severability of Interests Provision.

10.3  Automotive Liability: Business Auto Liability insurance for all owned, hired, and non-owned vehicles (including trailers), to be used in the performance of the Services under this Agreement, with minimum policy limits of $1,000,000, combined single limit, per occurrence, which may be met by any combination of Primary and Excess/Umbrella coverage; such policy shall include coverage for Contractual Liability.

10.4  Workers' Compensation insurance in accordance with the statutory requirements of each applicable state or federal jurisdiction where ISP provides Services under this Agreement.

10.5  Employer's Liability insurance with the following minimum policy limits: (a) Bodily Injury by Accident at $1,000,000 for each accident, (b) Bodily Injury by Disease at $1,000,000, and (c) Bodily Injury by Disease at $1,000,000 for each employee.  These limits may be met by any combination of Primary and Excess/Umbrella coverage.

10.6  Additional Insured. All insurance coverage required under this Section 10 (except for Workers' Compensation insurance) shall name DHL and its parents and

subsidiaries, and their respective directors, officers, and employees as additional insured.

10.7  Cost of lnsurance. All of ISP's insurance deductibles, coinsurance payments, and uninsured exposures are at ISP's sole risk and are ISP's sole responsibility.  In accordance with Section 8.3 (Audits by DHL), ISP will provide proof to DHL of ISP premiums, charges, and fees related to their businesses with DHL 30 days prior to insurance renewal.

10.7.1  ISP must maintain a separate business entity established by Federal Employer Identification Number (FEIN) for DHL business only and separate from all non-DHL business.

10.7.2   Self-insurance retention programs are not allowed unless written authorization approval by DHL.

10.7.3  Insurance Deductibles shall be no less than $1000.00 and no more than $2500.00 unless written authorization approval by DHL.

10.7.4  Disclosure to DHL and pre-approval.  Any requested insurance program exception would require disclosure of the program to DHL for review. These programs would include larger deductibles greater than Section 10.7.3. Disclosure to DHL will include but not limited to program structures and retention levels with collateral arrangements, captive insurance arrangements, loss projection details, risk transfer insurance premiums and expected claims costs.  Approval request would need to be in writing to DHL.

10.8  Waiver of Subrogation. All insurance required under this Section 10 shall contain provisions that there shall be no right of recovery or subrogation against DHL, DHL Express (USA), Inc., DHL Holdings (USA), Inc. or any of their respective subsidiaries, directors, officers, or employees.

10.9  Professional Employment or Employee Leasing Organizations. If ISP obtains any of its employees from a professional employment or employee leasing organization, ISP shall require that such professional employment or employee leasing organization provide all of the same coverage, limits, and endorsements as set forth in this Section 10.

10.10  Insurance Ratings. Each of ISP's insurers, for coverage required under this Section 10, shall (a) be licensed to conduct business in all jurisdictions where ISP provides Services under this Agreement, and (b) shall have a minimum A.M. Best ratings of A-, with a financial strength rating of at least VIII.

10.11  Certificates of lnsurance and Copies of Policies. Prior to, or concurrent with, the Effective Date, and during the Term, ISP shall furnish to DHL certificates of insurance evidencing the required insurance coverage and limits, as well as evidence of the Blanket Additional Insured endorsement, or showing that DHL (…and its parents and subsidiaries, and their respective directors, officers, and employees) has been endorsed into the required policies under this Section 10, endorsement for additional insured and the required language waiving rights of recovery and subrogation in favor of DHL. In addition, ISP shall provide to DHL true and accurate copies of all policies.  All policies shall have a Notice of

Cancelation Endorsement and each certificate shall state that DHL will be notified in writing 30 days before cancellation, material change, or renewal of insurance. ISP shall furnish to DHL certificates for replacement insurance meeting the requirements of this Section no less than seven days prior to the effective date of any such cancellation, material change or renewal.  Certificates of insurance must be mailed to the following address:

DHL Express

ATTN: ISP Contracts Relations Department

77 Comair Drive – 5th Floor

Erlanger, KY 41018

IC_Relations@dhl.com

10.12  <u>Cargo Liability Insurance</u>. ISP shall submit to DHL an insurance certificate evidencing Cargo Liability insurance, with limits not less than $100,000 per occurrence, and the deductible amount of which shall not exceed $5,000. ISP also shall supply to DHL a policy endorsement evidencing that DHL has been named as an Additional Insured or Loss Payee on such policy.

10.13  <u>Insurance Audit</u>.  Subject to Section 8.3 Audits by DHL, Service Provider will provide information related to their insurance program requested by DHL for review including but not limited to policies, including endorsements, invoices, financing agreements, schedule of vehicles including year, make, model, and value, garaging locations of vehicles, payroll data including job classification and base of operations, and loss run data.

10.14  <u>Failure to Obtain Required Insurance.</u> Failure of ISP to secure the insurance coverage required under this Section 10, or ISP's failure to supply DHL with certificates of insurance properly evidencing such coverage, minimum limits, and other specifications as set forth in this Section 10, shall in no way constitute a waiver of any sort, or relieve ISP from its obligations under this Agreement.  DHL reserves the right to purchase on behalf of Contactor, and be reimbursed by ISP, any coverage, with minimum acceptable limits, in this Section 10 that has lapsed for more than 14 days.

11.  <u>Representations and Warranties.</u>

11.1  <u>Mutual</u>.  Each party hereby represents and warrants that: (a) it has all requisite corporate power and authority (or if a party is not a corporation, such party represents and warrants that it has sufficient power and authority under its organizational documents or agreements) to enter into this Agreement and to carry out the transactions contemplated hereby; (b) the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate (or, as applicable, other entity) action on the part of such party; (c) this Agreement has been duly executed and delivered by such party and (assuming the due authorization, execution, and delivery hereof by the other party) is a valid and binding obligation of such party and enforceable against it in accordance with

provisions; and (d) its entry into this Agreement does not violate or constitute a breach of any agreement to which it is a party or otherwise bound.

11.2  <u>Disclaimer of Additional Warranties</u>.  Except for the representations and warranties expressly contained in this agreement, neither party makes any representations or warranties to the other party or to any other person under this agreement.  All other representations (including any representations that may have been made by either party in connection with any bid process relating to this agreement) and warranties, express or implied, including implied warranties of title, non-infringement, merchantability, and fitness for a particular purpose, are hereby disclaimed.

12.  <u>Indemnification.</u>

ISP agrees to indemnify, hold harmless and, at DHL's option, defend DHL and its affiliates, and their respective directors, officers, employees, ISPs, and agents (the "DHL Indemnified Parties") from all liabilities, damages, fees, fines, penalties, and claims of any kind, costs of suit, settlements, judgments, and any other expense (including attorneys' fees and costs) to which any of the DHL Indemnified Parties may be subjected, arising out of or in connection with:

12.1  the acts or omissions of ISP, its agents or any ISP Employee, including the delivery of in-bond shipments prior to release by the U.S. customs authorities;

12.2  any actual or threatened action, suit, claim, or legal, administrative, arbitration, governmental or other proceeding or investigation based on a theory that any of the DHL Indemnified Parties is an employer, joint employer, principal or agent of any ISP Employee, including but not limited to, any action, suit, claim, or legal, administrative, arbitration, governmental or other proceeding or investigation: (a) for unlawful discrimination, harassment, and/or retaliation of any kind; (b) under federal, state, municipal, or law for violations of wage and hour obligations, specifically including but not limited to minimum wage, overtime, double time, and/or meal and rest periods; and (c) any claims for violation of statute, labor code, regulation, tort, contract, executive order or common law.

12.3  any actual or threatened action, suit, claim, or legal, administrative, arbitration, governmental or other proceeding or investigation initiated by or on behalf of any ISP Employee for damage to property or bodily injury (including death), whether or not any such damage to property or bodily injury (or death) occurred while such ISP Employee was present at any facility of any DHL Indemnified Party or relating in any manner to an occurrence at any facility of any DHL Indemnified Party, unless such damage to property or bodily injury was caused by the gross negligence or willful act or failure to act of DHL;

12.4  any loss, damage, or delay of shipments while in ISP's possession;

12.5  any actual or threatened action, suit, claim, or legal, administrative, arbitration, governmental or other proceeding or investigation resulting from ISP's breach, or alleged breach, of any of its representations or warranties under Section 11.0;

12.6  any actual or threatened action, claim or legal, administrative, arbitration, governmental or other proceeding or investigation that alleges wrongdoing or liability caused, in whole or in part, by ISP or an ISP Employee; or

12.7  any failure by ISP to obtain the insurance coverage required under Section 10.0.

12.8  Any damage or loss occurring, and any actual or threatened action, suit, claim, or legal, administrative, arbitration, governmental or other proceeding or investigation resulting from any After Hours facility use by ISP pursuant to Section 12.0.

12.9  ISP's obligations to defend and indemnify DHL shall include the obligation to provide DHL separate defense counsel of DHL's choosing.  Nothing in section 12.0 shall be interpreted to cause ISP to indemnify DHL for DHL's own negligence or the negligence of any DHL employees.  To the extent that DHL is determined to have joint liability with ISP on a particular claim, ISP will indemnify DHL up to the amount equal to the percentage of fault allocated to ISP.

13.  Limitations of Liability.

13.1  Limitation on Certain Damages.  Subject to Section 13.3, in no event shall either party be liable to the other party for any special, indirect, punitive, or consequential damages of any kind (including lost profits, income, savings, business, or goodwill) in connection with any matter arising under or relating to this agreement, regardless of whether such liability is based on breach of contract, tort (including negligence), strict liability, breach of  warranty, or any other theory, even if such party has been advised of the possibility of such damages.

13.2  Maximum Aggregate Liability.  Subject to Section 26.3, in no event shall either party's maximum aggregate liability to the other party or any other person with respect to any and all matters arising under or relating to this agreement, whether arising in contract, equity, tort (including negligence), or otherwise, exceed the amounts paid by DHL to ISP hereunder during the three month period immediately preceding the first event giving rise to such liability.

13.3  Exclusions.  The limitations of liability set forth in Sections 13.1 and 13.2 shall not apply with respect to (a) a breach by either party of the respective obligations of confidentiality under Section 6, (b) ISP's indemnification obligations under Section 12, (c) the gross negligence or willful misconduct of a party, (d) any liability of ISP under Section 3.10, (e) a breach by ISP of Section 9.5.1, and (f) the proceeds of any insurance coverage required under Section 10.

13.4  Limitation on Claims.  No action, suit, proceeding, claim, counterclaim, or cross claim arising under or relating to this Agreement may be brought more than 12 months after the later of the first event giving rise thereto or the date when the party with reasonable diligence could have discovered the pertinent facts.  If any applicable law does not allow the claims limitations period to be 12 months, then the period for the filing of any claim shall be the shortest period or periods allowed by such law.

13.5  Essential Part of the Bargain.  Each party acknowledge that the limitations of liability and releases and waivers set forth in this Section 13.5 and the indemnification obligations set forth in Section 12 reflect a deliberate and bargained for allocation of risks between DHL and ISP and are considered by the parties to be an essential element of this Agreement without which the parties would not have entered into this Agreement.

14.  Dispute Resolution.

14.1  ARBITRATION AGREEMENT.  Unless contrary to applicable law, any controversy or claim (whether such claim sounds in contract, tort, or otherwise) arising out of or relating to this agreement, or the breach or alleged breach thereof, or the commercial or economic relationship of the parties, which the parties are unable to resolve within a reasonable time after written notice by one party to the other party of the existence of such controversy or dispute, shall be resolved by arbitration in accordance with the then-existing commercial rules of the American Arbitration Association ("AAA"), but not including the then-existing supplementary rules for class arbitrations in whatever form or under whatever title they may exist.  As to any covered claim, the parties each waive the right to a jury or bench trial, or other judicial resolution, and unless prohibited by law, the right to bring, maintain, participate in, be a member of, to serve as a representative for, or to receive money from any class, collective, or representative proceeding, whether in arbitration or otherwise.  Any arbitrator(s) shall no conduct a class arbitration or any other class proceeding.  Unless contrary to applicable law, the parties cannot act as private attorneys general or in any other representative capacity.  To the extent permitted by applicable law, the parties also agree that they waive any right to have their claims consolidated with, joined with, or combined with any claims of any other party or parties.  The parties further agree that they enforceability and interpretation of this paragraph (including its agreed-upon waiver of class action, consolidation, combination of claims in any matter, acting in any kind of representative capacity, and any other rights) will be reserved to a court, rather than to any arbitrator(s).

14.2  In the event of other proceedings and waiver of jury trial, if any of the parties' agreements to waive any of the matters listed in Section 14.1 above (including class action, consolidation, combination of claims in any manner, or acting in any kind of representative capacity) are determined to be void, unenforceable, unconscionable, invalid, or inapplicable for any reason, then the foregoing arbitration provision in its entirety shall be severed from the agreement and the agreement shall be treated as if the foregoing arbitration clause in its entirety had never been a part of the agreement.  In this event, and in the event that the claims between the parties are tried in a court or in some other forum, the parties hereby agree to waive any right to participate in, be a member of, or to serve as a representative for a class action with regard to any claim(s) they have or assert against one another.  No class or other class proceeding shall be conducted either in a court or in any other forum or proceeding.  The parties cannot act as private Attorneys General or in any other representative capacity.  The parties also agree that they waive any right to have their claims consolidated with, joined with, or

combined with any claims of any other party or parties. If and to the extent permitted by law, the parties agree that they each waive any right they may have or might have had to a trial by jury in any proceeding, regardless whether the proceeding takes place in arbitration, court, or in any other forum.

14.3 <u>Arbitration Procedure</u>. The arbitrator (which may be one or more arbitrators, as appropriate, selected or assigned to handle the arbitration) shall be appointed jointly by the parties hereto within 30 days following the date on which the arbitration is instituted. If the Parties are unable to agree upon the arbitrator(s) within such 30-day period, the AAA shall select an appropriate arbitrator(s) within 15 days thereafter. The arbitration will be conducted in English. The arbitrator shall have the authority to act upon motions for summary judgment, and to grant any remedy or relief that the arbitrator finds just and equitable within the scope of this Agreement, provided, that no such remedy or relief shall be inconsistent with the disclaimers of warranties, limitations of liability, indemnifications, restrictions on arbitration proceedings, and other provisions of this Agreement, and the arbitrator shall not have the authority to amend, modify, or delete any of the provisions of this Agreement, unless said provision violates applicable law. The decision of the arbitrator shall be binding and final upon both parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. However, because the arbitrator lacks authority to commit errors of law or legal reasoning, the award may be vacated or corrected for any such error in any court having jurisdiction. In the event of arbitration or suit, the prevailing party may be entitled to costs (including the cost of the arbitration) and reasonable attorneys' fees.

14.4 <u>Equitable Relief</u>. Notwithstanding anything to the contrary in this Agreement, in the event of an alleged violation of Section 6 ("Confidentiality") by either party, or an alleged breach by ISP of Section 7 ("Use of DHL Marks") or Section 9.5.1 ("Immediate Release of Shipments"), the party alleging such a violation may seek temporary injunctive or other appropriate equitable relief from any court of competent jurisdiction pending appointment of an arbitrator, without the need to post a bond or security of any type. The party requesting such relief shall simultaneously file a demand for arbitration of the dispute, and shall request that the AAA proceed under its rules for an expedited hearing.

14.5 <u>Confidentiality</u>. In order to facilitate the resolution of controversies or claims between the parties with respect to each party hereto, unless contrary to applicable law, such controversies or claims, including details regarding negotiations, arbitration, and settlement terms, shall be treated as Confidential Information of each party hereto in accordance with Section 6.0.

15. <u>Miscellaneous.</u>

15.1 <u>Entire Agreement</u>. This Agreement sets forth the entire understanding between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous representations (including any representations that may have been made by either party in connection with any bid process relating to this Agreement), discussions, negotiations, letters, proposals, agreements, and

understandings between the parties hereto with respect to the subject matter hereof, whether written or oral, including any previous "Cartage Agreement" entered into between the parties, with respect to the provision of cartage and other services in the Territory and Service Areas covered by this Agreement. This Section 15.1 shall not be interpreted to supersede any separate agreement the parties may enter into for the provision by ISP of cartage and other services in geographic areas other than the Territory and Service Areas covered by this Agreement.

15.2  Cooperation.  Upon request from DHL, ISP shall provide DHL with reasonable cooperation in investigating and resolving any claims by DHL's customers or any other third party (including any claims relating to theft, illegal activities, or claims of harassment or discrimination).

15.3  Conflicts of Interest.  If either party becomes aware of a conflict of interest relating to this Agreement, such party shall immediately notify the other party thereof and the parties shall work in good faith to resolve the conflict or otherwise resolve the situation.

15.4  Governing Law.  This Agreement shall be governed by, and interpreted and construed in accordance with, the laws of the State of Ohio, without regard to its provisions governing conflicts of law.

15.5  Amendments.  No amendment to, or change, or waiver, or discharge of, any provision of this Agreement shall be valid unless in writing and signed by an authorized representative of each of the parties.

15.6  Waiver.  No term or provision hereof will be considered waived by either party hereto, and no breach consented to by either party hereto, unless such waiver or consent is in writing signed on behalf of the party against whom the waiver or consent is asserted. No consent to or waiver of a breach by either party hereto, whether express or implied, will constitute a consent to, waiver of, or excuse for any other, different, or subsequent breach by such party.

15.7  Assignment.  ISP shall not assign or transfer this Agreement (or any rights hereunder), nor delegate any of its obligations hereunder, without the prior written consent of DHL. Any purported assignment in violation of this Section shall be null and void.

15.8  Notices.  All notices under this Agreement shall be in writing and delivered by fax, e-mail, in person, or sent by (a) commercial courier with written verification of receipt or (b) certified mail, return receipt requested, postage prepaid. Notices given by fax or e-mail shall be deemed delivered when such fax or e-mail is transmitted to the specified fax number or e-mail address of record and the appropriate confirmation is received. Notices mailed shall be deemed delivered three days after postmarked. Notices to ISP shall be sent to the fax number, e-mail address, or physical address set forth in the first page of this Agreement. Notices to DHL shall be sent to the fax numbers, e-mail or physical addresses set forth below. Each party may change its address for notification purposes by giving the other party written notice of the new address and the date upon which it shall become effective. Notices issued by DHL under Sections 7.4, 11.1, or 11.2 shall only be

valid if issued by DHL's "Manager of Contracts Administration" or designated representative.

To:

DHL Express
ATTN: Manager of Contracts Administration
77 Comair Boulevard
Erlanger, KY  41018
Fax:  (480) 760-4094

E-Mail: IC_Relations@dhl.com

15.9  <u>Third Party Beneficiaries.</u>  Except as expressly stated herein, nothing in this Agreement is intended to confer benefits, rights, or remedies unto any person or entity other than the parties hereto and their successors and permitted assigns.

15.10  <u>Parties Advised by Counsel</u>.  This Agreement has been negotiated between unrelated parties who are sophisticated and knowledgeable in the matters contained in this Agreement and who have acted in their own self-interest.  In addition, each party has been represented by legal counsel (or has had the opportunity to be represented but has elected to proceed without such representation).

15.11  <u>Interpretation</u>.  The provisions of this Agreement shall be interpreted in a reasonable manner to affect the purposes of the parties, and this Agreement shall not be interpreted or construed against any party to this Agreement because that party, or any attorney or representative for that party, drafted this Agreement or participated in the drafting of this Agreement.  Unless the context of this Agreement clearly requires otherwise, (a) references to the plural include the singular, the singular the plural, the part the whole, (b) references to any gender include all genders, (c) "or" has the inclusive meaning frequently identified with the phrase "and/or," (d) "including" has the inclusive meaning frequently identified with the phrases "but not limited to" and "without limitation," and (e) references to "hereunder" or "herein" relate to this Agreement.  The Section headings in the Agreements are for reference and convenience only and shall not be considered in the interpretation of the Agreement.

15.12  <u>Severability.</u>  If any provision of this Agreement is held by a tribunal of competent jurisdiction to be illegal, invalid, or otherwise unenforceable in any jurisdiction, then to the fullest extent permitted by law (a) the same shall not effect the other terms or provisions of this Agreement, (b) such term or provision shall be deemed modified to the extent necessary in the tribunal's opinion to render such term or provision enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly, preserving to the fullest extent the intent and agreements of the parties set forth herein and (c) such finding of invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of such term or provision in any other jurisdiction.  Notwithstanding the foregoing, the limitations of liability in Section 15 are considered by the parties to be integral to this Agreement and may not be modified or severed from this Agreement.

15.13  Counterparts. This Agreement may be executed in two counterparts, each of which shall be effective as of the Effective Date, and all of which shall constitute one and the same instrument.  Each such counterpart shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

15.13.1  Faxed or Electronic Signatures.  Any signature on this Agreement, or any amendment or modification thereof or any document or instrument signed by either of the parties in connection herewith, that is sent by facsimile or via e-mail of a ".pdf" file or by electronic signature systems such as "DocuSign", shall be considered valid and binding, the parties agreeing that they intend and desire to be bound by any such signatures sent by electronic means.

15.14  Execution and Delivery.  This Agreement shall be deemed executed by the parties when any one or more counterparts hereof, individually or taken together, bears the signatures (and, on each page requiring a party's initials, the initials) of each of the parties hereto.  This Agreement, once executed by a party, shall be delivered to the other party in accordance with the provisions of Section 15.8, except that facsimile copies shall not constitute delivery under this Section 15.14.

15.15  DHL Identifiers.  DHL may from time to time assign reference numbers, names, or codes to ISP, the Territory and Service Areas, the Services (or portions thereof), or other items or information associated with this Agreement.  At DHL's request, ISP shall use such numbers, names, or codes in its correspondence with DHL.

# Appendix 1

# Independent Service Provider Employment Letter of Understanding

I am being employed as an employee for Independent Service Provider Company (ISP), _____. The ISP Company has a contract agreement between its owner(s) and principal(s) to perform transportation services for DHL Express.

The ISP Company will provide me with my details of employment including which include:

- Hours worked and schedule
- Type of work
- Pay rate schedule and benefits
- Management structure of ISP Company

I understand I do not work for DHL Express and I will not receive any information on my employment status including work assignment, pay checks, benefits, nor hours worked from DHL Express and its assigned management. Furthermore, I am not entitled or otherwise eligible to participate in or receive any benefits or rights as employees of DHL, under any employee benefit and welfare plan, including, any employee insurance, pension, savings, or security plan, and shall have no rights to compensation from DHL

Independent Service Provider Employee Name:_____

Independent Service Provider Employee Signature:_____

Date: _____

# Appendix 2

## Independent Service Provider Certification of Compliance

I, _____, as an owner, director, principal of ISP Company,

_____, certify to DHL our compliance with certain provisions of the Cartage Agreement below.

- Section 3.4.2 – Status of ISP's Employees including signed Letter of Understanding

- Section 3.4.3 – Alcohol and Drug Screening

- Section 3.4.4 – Background Screening

- Section 3.4.4.1 – Denied Parties Screening

- Section 3.4.5 – Orientation and Training of ISP Employees to DHL Business

- Section 4.0 – Compliance with Specific Laws

- Section 4.3.5 – Certification of Security Threat Assessment of all ISP Employees

I further certify that we are in compliance with the following:

- Compliance with 100% of all badges returned to the C-Net or issuing authority on all terminated and separated employees no longer employed by your company. (Section 3.4.4.1)

- Compliance with EPA Smart way Certification and reporting. (Section 8.3.2)

- Compliance with all Insurance Requirements in Section 10 of the Cartage Agreement.

- Compliance with the DHL requirements of branding, debranding, and accurate DX Number reporting of vehicle status (active, retired, and location). (Section 3.5)

Independent Service Provider:_____

Signature:_____

Printed Name:_____

Title:_____

Date: _____

# Section 9.3 Termination without Cause Schedule – Appendix 3

Independent Service Provider: _____

Termination Effective Date: __MM/DD/YYYY_

A.    Termination Date: The date on which Contractor shall cease performing Services (whether due to a termination notice or a notice of non renewal, pursuant to Section 9.3.1.1 of the Cartage Agreement is MM/DD/YYYY.

B.    Transition Payment:  The Transition Payment to be paid pursuant to Section 9.3.1.1 of the Cartage Agreement is (Total Transition Amount).

DHL shall pay ten percent (10%) of the Transition Payment (10% of Transition Amount) within thirty days after this document is agreed to and signed.

DHL shall pay the remaining ninety percent (90%) (90% of Transition Amount) within thrity days after the Termination Date.

C.    Release:  As consideration for the payment under Section 9.3.1.1, Contractor does hereby forfeit, abandon, release, remise and forever discharge and hold harmless DHL and its past and present employees, officers, directors, managers, stockholders, and agents, as well as DHL's predecessors, successors, parents, subsidiaries, and affiliated corporations of and from any and all liability, claims, rights, liens, remedies, debts, obligations, damages, injuries or causes of action of whatever nature or kind at law or equirty or otherwise which Contractor now has or which it may hereafter discover or acquire connected with and/or in any way arising directly or indirectly out of: (1) business relationship between DHL and Contractor, (2) negotiations of or operations under the Cartage Agreement or any other agreements between DHL and Contractor, (3) the termination or expiration of the Cartage Agreement, and/or (4) any other act or omission or damage or thing done or caused by any one or more of the DHL released parties that occurred, or that may have been sustained or incurred by Contractor, at any time prior to the termination of the Cartage Agreement.

Agreed to by:

**ISP COMPANY NAME**                                    **DHL Express (USA), Inc.**

Signature:_____               Signature:_____

Printed Name:_____               Printed Name:_____

Authorized representative for Contractor            Title: _____

Date: _____                    Date: _____

                                                                 **DHL Express (USA), Inc**.

                                                                 Signature: _____

                                                                 Printed Name: _____

                                                                 Title: _____

                                                                 Date: _____