

# CASE NO. 2:25-CV-02588-SHL-TMP

## MARY L. WARREN

## vs

## FLYWAY EXPRESS, LLC, ET AL.

## DEPONENT:

## BRIAN COX

## DATE:

## APRIL 15, 2026

Page 14

Q.   They're different?  Okay.  What is different --

A.   The Horn Lake --

Q.   -- about them?

A.   Yeah.  The Horn Lake facility is just the offices.  It's where we store our records -- our --

Q.   Okay.

A.   -- employee records, vehicle records; things like that.  There's no -- no vehicle dispatching or anything out of that facility.  It all comes out of the Memphis.

Q.   And the Memphis location is really close to Winchester Road?

A.   Yes, sir.  Right off Winchester.

Q.   Okay.  Have you seen the e-mail that you drafted to Kellie, Mike McCord, and Mikos Vonn about Clark White termination?

A.   I have.

Q.   All right.  And if -- can you tell me the date of that e-mail?

A.   Off the top of my head, I do not know.  I can look it up.

Q.   Okay.

A.   You want me to look it up for you?

Q.   No.  If -- the e-mail I'm looking at, if it

Page 15

purports to have a date of May the 21st, 2024, would you dispute that?

A.   No, sir.  It appears that's the correct date.

Q.   Okay.  So within a day of May 20th, the company knew that Mr. Clark White had possibly done something that he shouldn't have done, and they recommended he be terminated -- or terminated him?

A.   Absolutely.

Q.   I've been unclear whether or not he terminated it -- he was terminated or whether he quit.  Do you know which one happened?

A.   Well, I believe when he -- when he had his accident, he returned to the station, that he knew he had done something that was going to result in termination.  So he took it upon himself to go ahead and leave --

Q.   Okay.

A.   -- is my understanding.

Q.   All right.

A.   Yeah.

Q.   Is he eligible for rehire?

A.   No, sir.

Q.   Okay.  Why not?

A.   Well, because he was -- the integrity issue is a big thing with us, and that was just, you know.  The

Page 16

way he left, we -- we don't like to bring back people that have done us -- done us like that, so...

Q.   Okay.  There have been some witnesses that say that there were two DHL vehicles or vans racing each other on May the 20th, 2024.  Have you conducted an investigation or authorized an investigation to see if there was, in fact, another vehicle involved with this incident?

MR. ROBINSON:  Object to form, but answer if you can.

THE WITNESS:  We tried.  I believe we started looking pretty late for -- for information that would be stored, but as of knowledge that we had at that -- particular time when we had -- we had no idea that there was any other accidents or people involved.

BY MR. MOORE:

Q.   How does it make you feel sitting here today to know that there could be, potentially, if this -- if the other witnesses are correct, that there's a person that has not been caught that's still roaming the streets of Memphis that's employed by Flyway Express, that may have been somebody that was doing something so crazy as racing a DHL or Flyway Express vehicle?

MR. ROBINSON:  Object to form.  Answer if you

Page 17

can.

THE WITNESS:  It would not make me feel well at all, Mr. Moore.  I believe with our current set up, that's not happening, but, no.  In no circumstance do we tolerate erratic driving, unsafe driving at -- at all. That right is --

BY MR. MOORE:

Q.   You said your "current setup."  What is different about your current setup than the setup you had on or about May 20th, 2024?

A.   Well, we have dashcams in all of our vehicles now, that are working.  We've -- we've condensed -- we've condensed our -- our fleet down to a newer model fleet that has better telematics and better video recording.

Q.   Okay.  Was this not possible to have in 2024?

A.   It was -- it was a ground game.  We were in the mix of swapping over a bunch of units.  We were coming out of Covid. We were retiring a lot of the older fleets.  We were doing some swapping.  So we did have some of those units that weren't equipped on the road. Quite a few, actually.

Q.   Now, 2024, you should have been well out of Covid.  Covid ended around '21, didn't it?

A.   It did, but the --

Tristar Court Reporting
3102 West End Ave
Suite 400
Nashville, TN 37203

TriStar
COURT REPORTING
MEMPHIS NASHVILLE KNOXVILLE

(615)616-8065
schedule@tristardepos.com
www.tristardepos.com

Page 22

to the severity of it, why not push that in there? Not sure where it came from. I -- like, again, I haven't -- we've -- I think we've pushed everything we had, Mr. Moore.

BY MR. MOORE:

Q. Yeah. Now --

A. Don't see any evidence. That's not a --

Q. -- fortunately, only one of the vehicles would have been involved in the wreck. So the other person just gets away scot-free. I mean, there's no -- he's not going to confess and there's no evidence of that vehicle. How do you ever figure out who did it?

MR. ROBINSON: Same objection.

THE WITNESS: I don't believe there are any -- there was another vehicle.

BY MR. MOORE:

Q. Mr. White would know. Whenever we talked to him, he would know who he was racing or if he was racing somebody.

MR. ROBINSON: Object to form, again. Answer if you can.

THE WITNESS: I haven't talked to Mr. White. He's been unresponsive for all the time that we reached out to him regarding this. My understanding is that no one's heard from him.

Page 23

BY MR. MOORE:

Q. No other -- no future -- possible future employers ever call for a reference anything; to your knowledge?

A. Not to my knowledge. No, sir.

Q. What's your policy on references when someone leaves the company?

A. Can you clarify that a little bit?

Q. In regards to Mr. White, would you be giving him a neutral reference, a good reference, or a bad reference; if someone called?

A. It'd be a neutral reference.

Q. Okay.

A. Yes, sir.

Q. And why is that?

A. We kind of have a policy. We don't -- we -- we don't give bad references. It's just something we don't do.

Q. Okay.

A. Yeah. It's --

Q. So you just pass the buck and let them figure it out on their own that the person's bad?

MR. ROBINSON: Object to form.

THE WITNESS: We don't give them a -- we don't give them a positive reference.

Page 24

BY MR. MOORE:

Q. Okay.

A. We politely decline to give a reference.

Q. All right. My next area of inquiry: Who's over the HR function -- human resources function?

A. Kellie kind of assumed the HR seat. So, historically, we've been a small company, and Kellie kind of runs the HR, so to speak, but that's -- that's the -- our HR department right now.

Q. She's the entire department?

A. Yes, sir. And we -- we talk to her about issues or things that -- that we need to as upper management.

Q. And what is her title?

A. Kellie's title is -- it's human resources.

Q. Human resources manager, specialist, associate clerk?

A. We call her the manager.

Q. Okay. Y'all may want to tell her because like when I asked her what her title was, she just said "human resources." She didn't say human resources manager. She just said "human resources," but human resources is a function. It's not a title.

A. Agree.

Q. All right. So --

Page 25

A. We're a small company.

Q. In your mind, she's the human resources manager and you're the vice president. So she'll be safe to call herself human resources manager?

A. Agree.

Q. Okay. All right. So I asked her, and I'm asking you, about a new hire checklist. I don't know if you've seen this in your capacity, but it's something that the company produced -- or the lawyer for the company. It's Bates stamped Warren 75. Have you seen the new hire checklist for Clark White, Jr.?

A. I have not.

Q. Okay. All right. Well, I have it here, and I've discussed it with Kellie, but I want to ask you: Are employees expected to undergo couriers -- specifically, are they expected to undergo a drug screen prior to driving the vans with the company?

A. Yes, sir.

Q. All right. And how do you verify that they have, in fact, undergone a drug screen?

A. When they're sent to do the drug screen as part of the -- as part of the onboarding process, that we have to have the clean drug screen for them to be green lit, so to speak, and their managers to start them.

Tristar Court Reporting
3102 West End Ave
Suite 400
Nashville, TN 37203

TriStar
COURT REPORTING
MEMPHIS NASHVILLE KNOXVILLE

(615)616-8065
schedule@tristardepos.com
www.tristardepos.com

Page 30

remember those key points.  So they do remain safe and do not make bad decisions while driving.

Q.   Has there been -- in the course of your employment with -- or your tenure with the company, with Flyway Express, do you know of any other instance where there have been allegations of drivers -- a driver or drivers racing the company vehicles?

A.   I do not.

Q.   Do you know of any other instance where there has been a phantom incident where your van came back damaged, but no one knew what happened?

MR. ROBINSON:  Object to form.  Answer if you can.

THE WITNESS:  Not off the top of my head.  I'm sure it's happened, but not to -- nothing like this. No, sir.

BY MR. MOORE:

Q.   All right.  Have all of your answers been truthful here today?

A.   Yes, sir.

MR. MOORE:  All right.  I tender the witness.

MR. ROBISON:  Mr. Cox, just a quick follow up about the drug screening.

CROSS-EXAMINATION

BY MR. ROBINSON:

Page 31

Q.   Even if there is a missed checkmark on a paper form for intake, do you believe that all the couriers that were hired by Flyway did, in fact, go through the drug screen process and have a clear drug screen before they were allowed to drive for the company?

MR. MOORE:  Object to the form.  Calls for speculation.

THE WITNESS:  I -- I do.  I do.  I think that checklist was just something to -- to guide them in the right direction, just kind of like a -- a sticky note type thing and I believe they just didn't properly fill that out, would be my answer to the drug tests.

MR. ROBINSON:  That's the only question I had.

MR. MOORE:  I have a follow up question.

REDIRECT EXAMINATION

BY MR. MOORE:

Q.   Mr. Cox, have you gone back to look in Mr. White's file?  Because in the court of law, we don't deal with speculations.  We deal with reality.  Have you gone back to look, to see if, in fact -- there was, in fact, a drug test done and someone just missed it on checking the check -- the right box on the checklist, but there was, in fact, a drug test done by some company?

Page 32

A.   I believe they did try to -- try to locate that and they were unsuccessful.

Q.   All right.  And so, having the knowledge that they were unsuccessful in finding any proof, and as the saying, when I was come up, there's -- the proof is in the pudding.  No proof there's in the pudding, but you still believe that it was done.  Is that just a --

MR. ROBINSON:  Object to form.

BY MR. MOORE:

Q.   -- hopeful prayer that that was done or you really believe it was done?

MR. ROBINSON:  Object to form.  Answer if you can.

THE WITNESS:  I would think there was a good chance of being done, Mr. Moore.

BY MR. MOORE:

Q.   Do you want to quantify that percentage of the chance that was done?

A.   90 percent chance that that drug test was administered before he was hired.  It's not speculation.

Q.   But with all the technology that exists in the 21st century, you can't go back and, if it was done, have some kind of proof that it was done at this point?

A.   I believe they were -- I -- I -- the -- the company that administered the drug test for us at the

Page 33

time, had been turned over, I believe, twice since then and getting the records from them, we were also unsuccessful, but, yes.  I agree.  It's -- it's unfortunate that we can't find that right now or hadn't been able to.

Q.   Have you gone back to ask the hiring manager that was there at the time that onboarded him, to see if they recall seeing the results of the drug test?

A.   I mean, we've asked.  They kind of get the same -- they were giving the same -- same answer as I am, but the recollection that far back isn't -- and it's not -- it's not the solid recollection that -- that's going to prove what we want to prove.

MR. MOORE:  All right.  I tender the witness, again.

MR. ROBINSON:  No further questions from me.

MR. MOORE:  Oh, we're done.  It's a pleasure to meet you, Mr. Cox.

MR. COX:  You too, Mr. -- Mr. Moore.

MR. MOORE:  All right.

MR. COX:  Thanks guys.

MR. MOORE:  Thank you.

THE REPORTER:  Okay.  Before we go off the record, do either one of y'all want a copy of the transcript?

Tristar Court Reporting
3102 West End Ave
Suite 400
Nashville, TN 37203


TriStar
COURT REPORTING
MEMPHIS NASHVILLE KNOXVILLE

(615)616-8065
schedule@tristardepos.com
www.tristardepos.com